# Illinois Official Reports

## Appellate Court

*Ameren Illinois Co. v. Illinois Commerce Comm'n,*
2015 IL App (4th) 140173

| | |
|---|---|
| Appellate Court Caption | AMEREN ILLINOIS COMPANY, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; THE CITIZENS UTILITY BOARD; THE ILLINOIS INDUSTRIAL ENERGY CONSUMERS (Archer-Daniels-Midland Company, Caterpillar, Inc., Air Products and Chemical Company, and United States Steel Corporation-Granite City Works); and THE OFFICE OF THE ATTORNEY GENERAL, Respondents.–DOMINION RETAIL, INC., and INTERSTATE GAS SUPPLY OF ILLINOIS, INC., Petitioners, v. THE ILLINOIS COMMERCE COMMISSION; AMEREN ILLINOIS COMPANY, d/b/a AMEREN ILLINOIS; THE CITIZENS UTILITY BOARD; THE PEOPLE OF THE STATE OF ILLINOIS; THE ILLINOIS INDUSTRIAL ENERGY CONSUMERS; THE ILLINOIS COMPETITIVE ENERGY ASSOCIATION; and THE RETAIL ENERGY SUPPLY ASSOCIATION, Respondents. |
| District & No. | Fourth District<br>Docket Nos. 4-14-0173, 4-14-0182 cons. |
| Filed | June 2, 2015 |
| Decision Under Review | Petition for review of order of Illinois Commerce Commission, No. 13-0192. |
| Judgment | Affirmed. |

Counsel on Appeal

Albert D. Sturtevant (argued), of Whitt Sturtevant LLP, of Chicago, Edward C. Fitzhenry, of Ameren Services Company, and Andrew J. Campbell, of Whitt Sturtevant LLP, of Columbus, Ohio, for petitioner Ameren Illinois Company.

Stephen J. Moore (argued), Thomas H. Rowland, and Kevin D. Rhoda, all of Rowland & Moore LLP, of Chicago, for petitioners Dominion Retail, Inc., and Interstate Gas Supply of Illinois, Inc.

James E. Weging (argued), Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

Julie L. Soderna, Christie Redd Hicks, and Kristin Munsch, of Chicago, for respondent Citizens Utility Board.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Justice Steigmann concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    In tariffs it filed with the Illinois Commerce Commission (Commission), Ameren Illinois Company (Ameren) proposed increasing its rates for natural gas. The Commission suspended the tariffs and held an evidentiary hearing on them. The hearing culminated in a lengthy written decision by the Commission. Ameren appeals from one aspect of that decision, namely, the rate of return the Commission allowed Ameren on its equity. We are unable to say that, in setting the rate of return, the Commission made a decision that was against the manifest weight of the evidence. Therefore, in Ameren's appeal, case No. 4-14-0173, we affirm the Commission's decision.

¶ 2    The other appeal, case No. 4-14-0182, which we have consolidated with Ameren's appeal, arises from the same administrative case but concerns different tariffs. After filing its tariffs proposing an increase in gas rates, Ameren filed "rider" tariffs proposing the establishment of a small volume transportation program, a program that would allow retail gas suppliers to use Ameren's infrastructure to deliver natural gas to customers who chose to enter into contracts with the retail gas suppliers. The Commission approved the small volume transportation program but required retail gas suppliers to abide by three consumer protections, over and above those that statutory law already provided. Two interveners, Dominion Retail, Inc., and Interstate Gas Supply of Illinois, Inc. (which we will call, collectively, "the retail gas

suppliers," "the alternative gas suppliers," or simply "the suppliers"), challenge the three consumer protections. They contend the Commission lacked statutory authority to require these protections, and they also contend there was no evidence that the protections were even necessary. We conclude the Commission had statutory authority to require the inclusion of the new consumer protections in the small volume transportation tariffs. The suppliers insist that little or no historical evidence justified these protections. But that is no reason to overturn them. A protection can serve the legitimate function of preventing an injury from ever happening. Viewing the new consumer protections that way, we defer to the Commission's judgment that they would be just and reasonable conditions in Ameren's small volume transportation tariffs. Therefore, we affirm the Commission's decision in the suppliers' appeal as well.

## I. BACKGROUND
### A. Ameren's Revenue Requirement
#### 1. *The Capital Asset Pricing Model*
##### a. An Introduction to This Model

To determine the rates a public utility may charge its customers, the Commission must determine the utility's revenue requirement. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991). The revenue requirement equals the utility's operating costs plus the rate base multiplied by an allowed rate of return. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 26. In the rates a regulated utility charges its customers, it not only deserves to be compensated for its operating costs, but it also deserves a return on its investment: a return on the rate base. *Id.* (The "rate base" is "the total value of all invested capital." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 130302, ¶ 10.)

In setting rates, the Commission has to decide what, in the mind of a reasonable investor, would be an attractive enough return on the present value of the utility's property. *Id.* ¶ 11. For several years, the Commission has used the capital asset pricing model (CAPM) to determine the minimum rate of return needed to entice a reasonable investor to invest in a public utility. (As we will discuss later, the Commission also uses the discounted cash flow (DCF) model. But Ameren does not appeal any aspect of the Commission's application of the DCF model in this case.)

According to the CAPM, the required rate of return is a function of three things: (1) a risk-free rate of return; (2) the premium that average-risk stocks must pay over the risk-free rate to entice investors; and (3) the riskiness of the utility's equity in comparison to average-risk stocks. Peter V. Pantaleo & Barry W. Ridings, *Reorganization Value*, 51 Bus. Law. 419, 433 (1996). The CAPM formula regards these three things as having the following relationship:

Cost of equity = R(f) + (Beta x [R(m) − R(f)])

Where: R(f) = risk-free rate of return

Beta = beta coefficient of the utility's stock, which measures the volatility of the utility's stock in comparison to the volatility of the market as a whole

R(m) = expected rate of return on a market portfolio comprised of a large number of diversified stocks, *i.e.*, the expected rate of return on average-risk stocks. See *id.*

¶ 10        Expressed in words, the formula means this. The cost of the utility's equity–the required rate of return for the utility–"is equal to the sum of the risk-free rate of return plus a risk premium (*i.e.*, a return above the risk[-]free rate)." *Id.* The formula assumes that if investing in the utility would yield a rate of return no greater than that of Treasury securities, which are the prototypical risk-free investment, no sensible person would invest in the utility. The utility would be riskier than Treasury securities, and any rational investor would want compensation, a premium, for the additional risk. Therefore, to entice investors, the utility has to offer a risk premium, some amount above the risk-free rate. In the formula above, the symbols to the right of the plus sign determine that risk premium.

¶ 11        The risk premium the utility must offer is determined by multiplying the volatility of the utility's equity by the market premium, the premium that investors expect the market as a whole (the average-risk stocks) to pay above a risk-free investment (Treasury securities). Pantaleo and Ridings explain it this way–and for our purposes, the "target company" is the utility:

> "As noted, the yield on treasury securities is generally the best measure of the risk-free rate. The difference between the expected return on a 'market portfolio,' like the Standard & Poor's 500, and the risk-free rate is a measure of the premium the market is expected to pay above a risk-free investment. This market premium is commonly determined by reference to published data that tracks the average return on a given market portfolio and the average return on treasury securities over the same extended period of time (usually from 1926 or 1945 to the present). *** A beta coefficient greater than one means that a stock is more volatile than the market generally, as represented by a portfolio of a large number of stocks. *** A beta coefficient equal to one means that a particular stock is no more or less risky than the risk of the market itself. *** As the formula shows, a beta greater than one magnifies the cost of equity for a target firm. This makes sense because greater risk requires a greater return. Therefore, if the equity investment in a target company is riskier than the 'average risk' of stocks represented by a market portfolio, the premium above a risk-free investment the target would have to pay in order to attract equity investors should be some multiple (higher than one) of the premium payable by the less risky 'average risk' stocks. A target's beta is that multiple." *Id.* at 434-35.

¶ 12        If the target company is publicly traded, its beta can be found in financial publications, such as *Value Line* and *Zacks*. But what if the target company is not publicly traded? Because Ameren is not publicly traded and hence there is no market data available for Ameren stock, the only way to estimate Ameren's beta is to use the betas of a proxy group of publicly traded gas companies that appear to pose about the same amount of risk as Ameren.

¶ 13                            b. The Controversy Over Measurement Periods for the Beta
¶ 14                            i. *The Staff's Use of Five-Year Measurement Periods*
¶ 15        The Commission's staff (Staff) entered its appearance in the administrative hearing, and a member of the Staff, Rochelle Phipps, presented her CAPM analysis. To determine the beta coefficient, she used the same proxy group of gas companies that Ameren used in its CAPM analysis (except that she excluded one company). She obtained the betas of these proxy companies from *Value Line* and *Zacks*, and she also performed a regression analysis to estimate the beta. See Samuel C. Thompson, Jr., *Demystifying the Use of Beta in the*

*Determination of the Cost of Capital and an Illustration of Its Use in Lazard's Valuation of Conrail*, 25 J. Corp. L. 241, 266 (2000) (discussing the derivation of beta through regression analysis). As the Commission noted, all three of these sources–*Value Line*, *Zacks*, and the regression analysis–used a measurement period of 5 years (*i.e.*, 260 weeks or 60 months):

> "Ms. Phipps used Value Line's betas, Zack betas, and regression analysis to estimate beta for the gas sample. She explained that Value Line employs 260 weekly observations of stock price data, and then adjusts its beta. [Citation.] The regression analysis beta estimate for the gas sample employs 60 monthly observations of stock and the U.S. Treasury bill return data, and then the beta is adjusted. Like Staff's regression data, Zacks employs 60 monthly observations in its beta estimation; however, the beta estimates Zacks publishes are not adjusted; that is, they are 'raw' beta estimates. Thus, Ms. Phipps adjusted them using the same formula she used to adjust the regression beta. [Citation.] Ms. Phipps explained that adjusting raw beta estimates towards the market mean of 1.0 results in a linear relationship between the beta estimate and realized return that more closely conforms to the CAPM prediction. [Citation.]" *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 142 (Order Dec. 18, 2013).

Perhaps the order means that the "raw beta estimates" had to be "adjusted" to fit into the CAPM equation, whereby the number one signified the same level of risk posed by the market as a whole, any number greater than one signified a greater risk than the market, and any number less than one signified a lesser risk than the market.

¶ 16        In any event, the order continues:

> "Since both the Zacks beta estimate and the regression beta estimate are calculated using monthly returns (as Value Line uses), Ms. Phipps averaged the Zacks and regression betas to avoid over-weighting the monthly return-based betas. [Citation.] Then, she averaged that result with the Value Line beta to obtain a single estimate of beta for the sample. For the gas sample, the regression beta estimate is 0.54 and the Value Line beta and Zacks beta average 0.68 and 0.57, respectively. [Citation.] The average of the Zacks and regression betas is 0.56. Averaging this monthly beta with the weekly Value Line beta (0.68) produces a beta for the gas sample as 0.62. [Citation.] If Laclede Group is included in the gas sample, the regression beta equals 0.52, the average of the Zacks and regression betas equals 0.54 and the average of the Value Line beta with the monthly beta equals 0.60. [Citation.]" *Id.* at 142-43.

¶ 17        Thus, Phipps combined betas from *Value Line*, *Zacks*, and a regression analysis to estimate Ameren's beta. Also, to avoid giving too much weight to monthly returns, she averaged together the two monthly sources (*Zacks* and the regression analysis) before averaging that result with the weekly source (*Value Line*).

¶ 18                        ii. *Ameren's Use of an 18-Month Measurement Period,*
*a 24-Month Measurement Period, and*
*a 5-Year Measurement Period*

¶ 19        Ameren retained an expert, Robert Hevert, to perform a CAPM analysis. To determine Ameren's beta, he relied on published financial data regarding a proxy group of comparable gas companies which, for the most part, were the same proxies the Staff used. The Staff

objected to Hevert's analysis, however, because he "relie[d] on beta estimates that [were] measured over 18 to 24 months." *Id.* at 147. (We are quoting from the Commission's order of December 18, 2013, in which, for each issue, the Commission painstakingly summarized the parties' arguments and counterarguments before stating its own conclusions.) The Staff argued that "[b]etas measured over shorter time periods," such as 18 or 24 months, were "more prone to measurement error arising from short-term changes in risk and investor risk preferences, which [could] bias the beta estimate." *Id.* By contrast, the Staff relied on betas calculated with five years of data. *Id.* at 142, 164.

¶ 20 In part because Hevert used 18-month and 24-month measurement periods to determine the beta coefficient–measurement periods that the Commission regarded as too short–the Commission found the Staff's CAPM analysis to be more reliable than Hevert's CAPM analysis, and the Commission declined to average Hevert's CAPM analysis with the Staff's CAPM analysis and the parties' DCF results. The Commission stated:

> "In its Order in [*Ameren Illinois Co.*, Ill. Com. Comm'n No. 11-0282 (Order Jan. 10, 2012)], the Commission expressed 'serious concerns' with the betas used by Mr. Hevert. The Commission noted that it has traditionally relied upon betas calculated with five years of data. In the instant case, Staff again used a period of five years. Staff again takes issue with the beta measurement period used by Mr. Hevert, which in the current proceeding was 18 to 24 months. Staff explained why betas measured over shorter time periods, such as those used by Mr. Hevert, are more prone to measurement error arising from short-term changes in risk and investor preferences, which can bias the beta estimate. Having reviewed the record, the Commission again finds that the beta estimates provided by Staff are more reliable." *Id.* at 164.

¶ 21 In Ameren's application for rehearing, which it filed on January 16, 2014, Ameren pointed out to the Commission: "But Mr. Hevert used three different beta sources–one with an 18-month measurement period, one with a 24-month measurement period, *and a Value Line beta coefficient source that is based on five years of data* (same as Staff)." (Emphasis in original.) See 220 ILCS 5/10-113(a) (West 2012) ("No person or corporation in any appeal shall urge or rely upon any grounds not set forth in [an] application for a rehearing before the Commission."). Evidently, by the parenthetical remark "same as Staff," Ameren did not mean that the Staff, like Hevert, used an 18-month measurement period and a 24-month measurement but, rather, that *Value Line* was one of the sources the Staff used for its betas. He used *Value Line*, and the Staff used *Value Line*. Consequently, Ameren argued, the Commission erred by rejecting Hevert's CAPM analysis. Instead, according to Ameren, if 18 months and 24 months were too short as measuring periods, the Commission should have accepted Hevert's CAPM based only on *Value Line* betas and averaged his CAPM result with the Staff's CAPM result and the parties' DCF results. Ameren recalculated the rate of return that would result from excluding the 18-month and 24-month betas:

> "If the Commission wished to exclude the beta sources based on a shorter measurement period, and instead just use Mr. Hevert's Value-Line based CAPM model (with the 5-year measurement period), [Ameren's] CAPM result would be 10.11%. When averaged with the Staff's CAPM result and the Order's DCF result, this produces a return on equity of 9.35%, a full 27 basis points higher than the Order's authorized return on equity. Had the Commission followed [this] same [averaging] method it

approved in [*North Shore Gas Co.*, Ill. Com. Comm'n No. 12-0511, at 207 (Order June 18, 2013)], this 9.35% return on equity is the result that would have been reached."

¶ 22 On February 6, 2014, in a "Notice of Commission Action," the Commission denied Ameren's application for rehearing without specifically responding to Ameren's beta argument–or, for that matter, any other argument Ameren made in its application for rehearing. The ruling was simply a denial.

¶ 23 2. *The Controversy Over Non-Dividend-Paying Companies*
*in the Parameter for the Overall Market Return*

¶ 24 a. The Staff's Exclusion of Non-Dividend-Paying Companies

¶ 25 Again, the CAPM has three parameters: the risk-free rate of return, the expected rate of return on the market, and the beta.

¶ 26 To estimate the expected rate of return on the market, the Staff, specifically Phipps, performed a DCF analysis on the firms in the Standard & Poor's 500 Index, *excluding non-dividend-paying firms*. A DCF model "is premised on the assumption that a stock's price is the sum of the expected value of future dividends, discounted to present value by the rate of return investors require." *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 747 (1995). Therefore, the model uses "three variables: price, future dividends, and the rate of return." *Id.* Because dividends were a required variable in a DCF model, the Staff considered only companies that paid dividends.

¶ 27 Let us pause for a moment and, for clarity, restate what we said in the preceding paragraph. To calculate a parameter of the CAPM model, namely, the overall market return, the Staff used another model, the DCF model, but because of the way the DCF model worked, the Staff excluded non-dividend-paying companies, using only dividend-paying companies. As the Commission said:

> "[The Staff estimated] [t]he expected rate of return on the market *** by conducting a DCF analysis on the firms composing the S&P 500 Index ('S&P 500') as of June 30, 2013. [Citation.] Firms not paying a dividend as of June 30, 2013, or for which neither Zacks nor Reuters growth rates were available, were eliminated from the analysis. That analysis estimated that the expected rate of return on the market equals 12.33%. [Citation.]" *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 142 (Order Dec. 18, 2013).

¶ 28 In defending its exclusion of non-dividend-paying companies when estimating the market return, the Staff explained to the Commission: "A DCF analysis assumes that the market value of common stock equals the present value of the expected stream of future dividend payments to the holders of that stock. [Citation.] Since a DCF model incorporates time-sensitive valuation factors, it must correctly reflect the timing of the dividend payments that stock prices embody. [Citation.]" *Id.* at 140. (We are quoting the Commission's paraphrase of the Staff's argument.) Unless dividends were paid, it was impossible to know the timing of the dividend payments, and knowing the timing of the dividend payments was essential to doing a DCF analysis. See *In re Connect America Fund*, 28 FCC Rcd. 7123, 7159 n.156 (2013) ("The general DCF model cannot be used to calculate the cost of equity for a firm that does not pay dividends."); *In re Represcribing the Authorized Rate of Return for Interstate Services of Local Exchange Carriers*, 5 FCC Rcd. 7507, 7511 (1990) (before "DCF cost of equity calculations"

were made, "[t]he S & P 400 group and the electric group were to be screened to remove \*\*\* companies that did not pay quarterly dividends").

¶ 29                                 b. Ameren's Inclusion of Non-Dividend-Paying Companies

¶ 30    In his calculation of the expected overall market return, Ameren's expert, Hevert, used a constant-growth DCF model. *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 134 (Order Dec. 18, 2013). As Ameren explained to the Commission, a constant-growth DCF model "assumes constant unchanging growth as a component of the return an investor expects." *Id.* at 131. According to an apparently uncontested description by an intervenor in the administrative proceeding, the Illinois Industrial Energy Consumers, "the constant growth version of the [DCF] model is sometimes expressed as $K = D_1/P_0 + G$, where $K$ = Investor's required return, $D_1$ = Dividend in the first year, $P_0$ = Current stock price and $G$ = Expected constant dividend growth rate." *Id.* at 162. See *Midwest Independent Transmission System Operator, Inc.*, 141 FERC ¶ 63014, at 771 (2012) (setting forth the same formula).

¶ 31    In his use of the constant-growth DCF model to calculate the market return parameter of the CAPM, Hevert *included* the non-dividend-paying companies of the Standard and Poor's 500 Index. The Staff objected for the following reason:

> "Staff witness Phipps explained that Mr. Hevert's inclusion of the non-dividend paying companies in a constant growth DCF analysis upwardly biases his estimate of market return. [Citation.] That is, the dividend growth rate of non-dividend paying companies cannot be both constant and equal to the earnings growth rate as Mr. Hevert's estimation process assumes. If the dividend growth rate is constant, it must remain 0%. In contrast, the average dividend growth rates of the non-dividend paying companies in Mr. Hevert's analysis equal approximately 14%. [Citation.]" *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 148 (Order Dec. 18, 2013).

¶ 32    Ameren responded: "Ms. Phipps'[s] criticism is unfounded as investors do view investments in the context of the entire market; dividend paying and non-dividend paying investments alike." (Internal quotation marks omitted.) *Id.* at 135.

¶ 33    The Commission agreed with the Staff that the inclusion of non-dividend-paying companies was inconsistent with the constant-growth DCF model that Hevert used to estimate the average market return in the CAPM. The Commission said:

> "In [*Ameren Illinois Co.*, Ill. Com. Comm'n No. 11-0282], the Commission also expressed 'serious concerns' with the market risk premium relied upon by Mr. Hevert. There, as in the current case, Staff objected to Mr. Hevert's inclusion of non-dividend paying companies in the DCF analysis used in the calculation of the expected market return, from which the risk-free rate is subtracted in the calculation of the market risk premium. Staff contends that inclusion of non-dividend paying companies upwardly biases the estimate of the market return, as does [the Illinois Industrial Energy Consumers]. The Commission again shares this concern, and agrees with Staff that the market risk premium calculated by Staff is more reliable." *Id.* at 165.

¶ 34    In its application for a rehearing, Ameren made essentially three points. First, Ameren argued it made no sense to exclude non-dividend-paying companies from an estimate of the market return, considering that non-dividend-paying companies were part of the overall market. Second, "Hevert's model \*\*\* include[d] non-dividend paying stocks in the market risk

premium simply by recognizing the price appreciation of the stock over time." Third, the betas from *Zacks*, on which the Staff relied, "include[d] non-dividend paying companies," and thus, in Ameren's view, the Commission's "criticism of Mr. Hevert's use of the S & P 500 for his market risk premium [was] plainly arbitrary."

¶ 35    As we said, the Commission denied Ameren's application for a rehearing.

¶ 36    In summary, then, the Commission regarded Ameren's CAPM analysis as suffering from two flaws: (1) the use of short measuring periods for the beta and (2) the inclusion of non-dividend-paying companies in the constant-growth DCF analysis that Ameren used to calculate the market return in the CAPM.

¶ 37                         B. Newly Created Consumer Protections in a
                              Proposed Small Volume Transportation Program

¶ 38    In 2011, in a previous gas rate case (*Ameren Illinois Co.*, Ill. Com. Comm'n No. 11-0282, at 185 (Order Jan. 10, 2012)), retail gas suppliers recommended that Ameren establish a small volume transportation program that would allow residential customers and small commercial customers to buy gas from "alternative gas suppliers."

¶ 39    Under section 19-110(a) of the Alternative Gas Supplier Law, the Commission may license "alternative gas suppliers" to supply natural gas to "residential or small commercial customers." 220 ILCS 5/19-110(a) (West 2012). "Alternative gas suppliers"–another name for "retail gas suppliers"–basically are suppliers other than public utilities. 220 ILCS 5/19-105 (West 2012). The idea, apparently, is that alternative gas suppliers will supply natural gas to customers via the gas utility's infrastructure or delivery system. "Transportation services" are "services provided by the gas utility that are necessary in order for the storage, transmission and distribution systems to function so that customers located in the gas utility's service area can receive gas from suppliers other than the gas utility and shall include, without limitation, standard metering and billing services." *Id.*

¶ 40    At the conclusion of the 2011 case, the Commission ordered Ameren and interested stakeholders to participate in workshops, hosted by the Staff, to determine whether a small volume transportation program would be beneficial and feasible in Ameren's service territories. *Ameren Illinois Co.*, Ill. Com. Comm'n No. 11-0282, at 194 (Order Jan. 10, 2012). To the extent the workshops did not end in a consensus, the Staff was to report to the Commission the issues that remained in dispute. *Id.* On January 10, 2013, the Staff gave the Commission a report, which described the unresolved issues.

¶ 41    On January 25, 2013, pursuant to section 9-201(a) of the Public Utilities Act (220 ILCS 5/9-201(a) (West 2012)), Ameren filed new or revised tariff sheets, which proposed a general increase in gas delivery charges.

¶ 42    On March 6, 2013, pursuant to section 9-201(b) (220 ILCS 5/9-201(b) (West 2012)), the Commission entered an order suspending the tariffs, thereby initiating the present gas rate case.

¶ 43    A couple of weeks after filing its tariffs proposing a general increase in gas rates, Ameren filed "supplemental direct testimony" by Venda K. Seckler, its managing executive of gas supply, in which she stated that Ameren was "neutral with regard to the adoption of [small volume transportation (SVT),] consider[ing] the matter of question of policy to be determined by the Commission." Attached to her "supplemental direct testimony" were two exhibits:

Ameren exhibit Nos. 13.1 and 13.2. She described these two exhibits as two versions of a tariff pertaining to the proposed small volume transportation program. She testified: "Ameren Exhibit 13.1 is a copy of the last version of draft tariffs circulated to the workshop participants. Ameren Exhibit 13.2 is an updated version, including refinements [Ameren] added after the conclusion of the SVT workshop." (One might think a "tariff" is simply a list of prices, but actually, in the jargon of public-utilities regulation, "tariff" has a more expansive meaning, to include not only prices but also terms, conditions, rules, practices, and other descriptive text. See *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 28 ("A tariff is a public document setting forth services being offered, the rates and charges with respect to services, and the governing rules, regulations, and practices relating to those services.").)

¶ 44    Thus, the administrative hearing was not only on the tariffs proposing a general increase in gas rates but also on the "rider" tariffs proposing a small volume transportation program.

¶ 45    The Citizens Utility Board called its former executive director, Martin Cohen, to testify regarding the small volume transportation program. In his direct testimony, Cohen recommended that if the Commission approved such a program, it should order Ameren to include consumer protections that went beyond those in the Public Utilities Act. He did not as of yet specify what the additional consumer protections should be, but he suggested that additional consumer protections were necessary, given the complaints consumers had made about small volume transportation programs in northern Illinois. He cited two such complaints: one from 2002, *Citizens Utility Board*, Ill. Com. Comm'n No. 02-0425, and *Citizens Utility Board v. Illinois Energy Savings Corp.*, Ill. Com. Comm'n No. 08-0175.

¶ 46    It was not until later, in his rebuttal testimony, that Cohen proposed any specific consumer protections. He proposed the following three protections:

"1. A customer shall be absolved from paying any termination fees if, prior to the due date of their first bill, they notify the supplier that they are terminating the contract.

2. When a customer has accepted service from a supplier after solicitation by a door-to-door salesperson, there shall be no termination fees assessed if the customer terminates during the first 6 billing cycles.

3. If a supplier's marketing materials include a price comparison of the supplier rate and the gas utility rate, the depiction of such comparison shall display at least three years of data in no greater than quarterly increments and shall also display the supplier's offered price for the same or equivalent product(s) or service(s) for each of the same increments." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 225 (Order Dec. 18, 2013).

¶ 47    In their initial brief to the Commission, the retail gas suppliers objected to these proposed consumer protections for three reasons. First, they argued the consumer protections were "unnecessary in light of provisions in the [Public Utilities] Act that protect consumers and [in light of] the alleged decrease in customer complaints regarding existing SVT programs in Illinois." Second, the retail gas suppliers argued that "any customer protections should have been a part of the workshop process and need not be considered in this proceeding." Third, the retail gas suppliers complained that the Citizens Utility Board "did not offer its specific recommendations [(that is, these three proposals for consumer protection)] until rebuttal testimony." (In its brief, the Commission informs us that the rebuttal testimony of the intervenors–the Citizens Utility Board, the retail gas suppliers, and others–"was scheduled

simultaneously" and that "only Ameren was provided for surrebuttal in the established schedule.")

¶ 48 The Commission disagreed that the scope of the workshop discussions restricted the Commission's consideration of any small volume transportation issue. *Id.* at 247. The Commission also disagreed that the retail gas suppliers had been deprived of an opportunity to contest the proposed consumer protections. *Id.* at 248. The Commission noted that although Cohen first proposed these consumer protections in his surrebuttal testimony, the retail gas suppliers could have cross-examined him, but they did not do so. *Id.* The Commission agreed, however, "that the three measures at issue [were] not supported by the record." *Id.* Therefore–initially–the Commission decided the measures would "not be adopted at this time." *Id.*

¶ 49 Later, in an amendatory order of January 23, 2014, the Commission revised the order of December 18, 2013, so as to state: "[T]he Commission finds that the three measures at issue are supported by the record and will be adopted at this time." (This is the only change the amendatory order made.) *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 1 (Order Jan. 23, 2014).

¶ 50 Part IX of the order of December 18, 2013, the part pertaining to the small volume transportation program, concludes with the following paragraph:

"One of the 'resolved issues' is identified as 'SVT Program Separate Proceeding,' sometimes referred to as a tariff proceeding. [Ameren] shall file tariffs consistent with the findings of this Order. As indicated above, [Ameren] is directed to hold a workshop following the issuance of this Order, focusing on the issues that are not resolved by this Order, and to file a petition, tariffs and testimony in support of the SVT program within 45 days of the date of this Order. The separate proceeding shall be for the purpose of improving and editing the tariffs submitted in the instant proceeding, and to resolve the remaining issues not decided in this Order, to the extent a resolution of them is not reached in the workshop. All issues decided in the instant proceeding will be considered resolved for purposes of the second proceeding." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 251 (Order Dec. 18, 2013).

¶ 51 In their application for a rehearing, the retail gas suppliers argued to the Commission that the three consumer protections not only were unauthorized by statutory law but they lacked any evidentiary support in the record. In addition, the suppliers made a procedural objection. They argued that "cross-examination of a witness without pertinent experience [was] no substitute for alternative gas suppliers being able to sponsor knowledgeable witnesses who could have testified as to whether [the Citizen Utility Board's] proposals [were] burdensome, costly, difficult or ineffective."

¶ 52 The Commission denied the retail gas suppliers' application for a rehearing.

¶ 53                                    II. ANALYSIS
¶ 54                  A. The Commission's Rejection of Ameren's CAPM Analysis
¶ 55                                    1. *North Shore*
¶ 56 Ameren argues that in *North Shore Gas Co.*, Ill. Com. Comm'n No. 12-0511, at 205 (Order June 18, 2013) (hereinafter *North Shore*), the Commission established a "practice" of "averaging the parties' model results" together and that, in the present case, the Commission

- 11 -

arbitrarily and enigmatically departed from that "practice" by rejecting Ameren's CAPM analysis even though, in *North Shore*, the utilities used betas from *Value Line*, as Ameren did in the present case, and even though, in *North Shore*, the utilities included non-dividend-paying companies in their calculation of the market return in the CAPM, as Ameren did in the present case.

¶ 57        *North Shore* is distinguishable for three reasons. First, in *North Shore*, the utilities' expert, Paul R. Moul, consulted only one source for the beta parameter: *Value Line*. "For the beta measurement of systematic risk, he used the average *Value Line* for the Gas Group ***." *Id.* at 199. *Value Line* had a five-year measurement period. *Id.* at 200 ("259 weekly observations of stock return data"). In his expert testimony in *North Shore*, Moul gave his opinion of what the CAPM result should be (*id.* at 186), and for purposes of the beta, he based his opinion on that single five-year source, *Value Line* (*id.* at 199). In the present case, by contrast, when Hevert testified to what the CAPM result should be, he based his opinion on 3 measurement periods for the beta, the first 2 of which the Commission rejected as too short: 18 months, 24 months, and 5 years. As Ameren told the Commission in Ameren's application for rehearing, "[f]or the beta measurement, [Hevert] used coefficients from three sources, including Bloomberg and Value Line." It does not appear that Hevert ever offered a CAPM result premised on *Value Line* as the sole source for the beta. Instead, it appears that Ameren first did that on page five of its application for rehearing–which, of course, was not expert testimony. The Commission could have reasonably regarded CAPM analysis as a matter for expert testimony.

¶ 58        Second, it appears that, in *North Shore*, none of the parties objected to the inclusion of non-dividend-paying companies in a constant-growth DCF analysis. In fact, far from objecting, the Staff in *North Shore* included non-divided-paying companies in its own constant-growth DCF analysis. "[F]or the expected rate of return on the market parameter, Mr. McNally," a member of the Staff, "conducted a DCF analysis on the firms composing the S&P 500 Index"–which, as the parties agree in the present case, includes non-divided-paying companies. *Id.* at 201. And both McNally and Moul used a "constant growth DCF." *Id.* It would be unreasonable to count on the Commission to *sua sponte* raise any and all problems, such as including non-dividend-paying companies in a constant-growth DCF. The issue was forfeited in *North Shore*. See 83 Ill. Adm. Code 200.610(b) (2000) ("Objections must be made at hearing to preserve them on appeal."). The issue is preserved in the present case.

¶ 59        Third, the Commission stated in *North Shore* that it "[did] not endorse every input to or every aspect of the CAPM analyses performed by the Utilities or by Staff." *North Shore Gas Co.*, Ill. Com. Comm'n No. 12-0511, at 207 (Order June 18, 2013). Because the Commission did not specify, however, which of the CAPM inputs by the Staff the Commission found to be debatable, *North Shore* cannot be understood as establishing an across-the-board "practice" of averaging parties' CAPM results together. In other words, the "practice" of averaging could depend on the presence of the defective inputs, whatever they were. Perhaps that is why *North Shore* says: "*[F]or purposes of this proceeding*, the Commission finds that each provides useful input in estimating the market required return on common equity." (Emphasis added.) *Id.*

¶ 60        In sum, we disagree with Ameren's argument that the Commission arbitrarily departed from its decision in *North Shore*. Rather, for the reasons we have stated, *North Shore* is distinguishable.

2. *Findings That Ameren Claims Are Inconsistent With the Evidence*

¶ 62 a. Measurement Periods

¶ 63 Ameren says: "In the Order, the Commission rejected Mr. Hevert's CAPM analysis because of its apparent misunderstanding of what Mr. Hevert did. The Commission contended that Mr. Hevert's analysis should be disqualified because he used only 18- and 24-month betas, when in fact he also used 60-month betas."

¶ 64 The following sentence of the Commission's order could indeed be understood as assuming, incorrectly, that Hevert used only 18- and 24-month betas: "Staff again takes issue with the beta measurement period used by Mr. Hevert, which in the current proceeding was 18 to 24 months." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 164 (Order Dec. 18, 2013). Actually, the third source that Hevert consulted for his beta calculation, *Value Line*, measured betas over a five-year period. The order elsewhere acknowledges that "[t]o calculate his beta coefficients, Mr. Hevert utilized reported beta coefficients from Bloomberg *and Value Line* for each of the proxy group companies." (Emphasis added.) *Id.* at 134. And evidently the Commission was aware that *Value Line* used five-year measurement periods, for the order says: "[Phipps] explained that Value Line employs 260 weekly observations of stock price data ***." *Id.* at 142. It is as if, when summarizing the Staff's argument, the Commission overlooked what it had written only a few pages earlier.

¶ 65 Even after Ameren, in its application for a rehearing, disabused the Commission of its apparent misconception that Hevert had used only 18- and 24-month measurement periods for his beta, the Commission still rejected his CAPM analysis. The Commission still declined to average his CAPM result (as modified by Ameren in its application for rehearing) with the results of the other parties' experts to determine the rate of return. But the Commission included Phipps's CAPM result in the average. The question for us is whether, with the misconception dispelled, it is clearly evident that Hevert's modified CAPM result deserves as much weight as Phipps's CAPM result. See *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 20.

¶ 66 The answer is no–it is not clearly evident. When the 18- and 24-month sources were disqualified, Hevert was left with a single five-year source (*Value Line*) compared to Phipps, who relied on multiple five-year sources (*Value Line*, *Zacks*, and the regression analysis). Consequently, the Commission could reasonably regard her beta estimation as more reliable than his. Multiple beta sources could inspire more confidence than a single beta source. Indeed, the Commission had said in a previous case: "We agree that, in the same way we rely on multiple models to determine the cost of equity, Staff's well-considered use of multiple beta sources is beneficial to reduce measurement error from any individual estimate." *North Shore Gas Co.*, Ill. Com. Comm'n No. 09-0166, at 126-27 (Order Jan. 21, 2010). Also, Hevert never offered an opinion based on *Value Line* as a single beta source.

¶ 67 b. Non-Dividend-Paying Companies in a Diversified Portfolio

¶ 68 Another concern the Commission had with Hevert's CAPM analysis was his "inclusion of non-dividend[-]paying companies in the DCF analysis used in the calculation of the expected market return, from which the risk-free rate [was] subtracted in the calculation of the market risk premium." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 165 (Order Dec. 18, 2013).

¶ 69    For two reasons, Ameren regards this concern about non-dividend-paying companies as being against the manifest weight of the evidence: (1) non-dividend-paying companies are part of the overall market, which the market-return parameter should reflect; and (2) *Zacks*, from which the Staff obtained its own beta estimates, used the Standard & Poor's 500 Index, which included non-dividend-paying companies. We will discuss each of those two points.

¶ 70                              i. *Non-Dividend-Paying Companies*
                                 *as Part of the Overall Market*

¶ 71    Systematic risk is the risk posed by the market. *Furman v. Commissioner*, 75 T.C.M. (CCH) 2206, at 11 n.10 (1998). Unsystematic risk is the risk unique to a particular asset. *Id.*

¶ 72    The CAPM assumes that someone who is considering investing in a public utility has "the ability to hold[ ] diversified portfolios that eliminate, on a portfolio basis, the effects of unsystematic risk." *Id.* Because the CAPM assumes that an investor holding a diversified portfolio will encounter only systematic risk, the CAPM determines compensation only for systematic risk. *Id.*

¶ 73    The diversification of a stock portfolio eliminates unsystematic risk (*Thompson, supra*, at 247-48), and it is true, as Ameren says, that a diversified portfolio might well include stocks in non-dividend-paying companies. Even so, non-dividend-paying companies are not the *sine qua non* of a diversified portfolio. "[O]nce you have a portfolio of 20 or more stocks, diversification has done the bulk of its work." *Id.* at 248. (We need not regard this number 20 as magical; maybe the minimum number is 25 or 30 stocks.) Some of these 20 or more stocks could be in non-dividend-paying companies, or they all could be in dividend-paying companies. Diversification does not fail with the exclusion of companies that pay no dividends.

¶ 74    Because owning stock in non-dividend-paying companies is not absolutely essential to having a diversified stock portfolio that eliminates unsystematic (or unique) risk, the Commission could have reasonably decided that if a party chose to estimate the market return by using a constant-growth DCF model, it was preferable to exclude non-dividend-paying companies so as to avoid contradicting the constant-growth DCF model. Again, the Commission is the regulatory expert, and it is not "clearly evident" that including non-dividend-paying companies would be necessary or even logical, given the choice of a constant-growth DCF model, which presupposes growing dividends. *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 714 (1997).

¶ 75    We realize that Ameren argued to the Commission: "Hevert's model *** include[d] non-dividend paying stocks in the market risk premium simply by recognizing the price appreciation of the stock over time." But it is unclear how growth in the stock price could substitute for dividends, considering that the current stock price ($P_0$) and the dividend in the first year ($D_1$) are two separate variables in the equation.

¶ 76                           ii. *The Staff's Inclusion of Non-Dividend-Paying Companies*
                                 *in Its Estimation of the Beta*

¶ 77    Ameren accuses the Commission of having a double standard in that the Commission allowed the Staff to include non-dividend-paying companies in its estimation of the beta but

forbade Ameren to include non-dividend-paying companies in its estimation of the market return. Ameren argues:

> "Not only did Staff admit that non-dividend-paying companies are part of the market intended to be measured by CAPM, the record also shows Staff relied on market information (Zacks betas) that included non-dividend paying companies. Since the record shows Zacks uses the S&P 500 for its beta calculations, and the S&P 500 includes companies that do and do not pay dividends, criticism of Mr. Hevert's use of the S&P 500 for his market risk premium was plainly arbitrary and contrary to the record."

¶ 78     Ameren seems to argue, in effect: "Look, the Staff did the same thing and received a pass." But Ameren has not convinced us that the Staff really did the same thing. The Commission's order specifically says that when Phipps used a DCF model to calculate the market return, she excluded non-dividend-paying companies and that when Hevert used a constant-growth DCF model to calculate the market return, he included non-dividend-paying companies.

¶ 79     Ameren points out, however, that *Zacks* includes non-dividend-paying companies in its beta estimates and that by obtaining betas from *Zacks*, Phipps included non-dividend-paying companies. The problem, though, was not with non-dividend-paying companies *per se*. It was not that they were unsuitable for all purposes. Rather, as we understand the Commission's decision, the problem was it made no sense to apply a DCF model to non-dividend-paying companies. We do not see how Phipps did that by using *Zacks* for purposes of the beta parameter.

¶ 80     Granted, there is a certain lack of symmetry in including non-dividend-paying companies in the beta parameter while excluding them from the market-return parameter, but those two parameters are concerned with different things–the beta coefficient is concerned with the volatility of the utility compared to the volatility of the market as a whole, whereas the market return is concerned with the expected return from the market–and it is unclear to us what effect, if any, followed from this lack of symmetry. The Commission had a reason for excluding non-dividend-paying companies from the market-return parameter: to avoid a conflict with the constant-growth DCF model. In short, we are not financial analysts, and when we defer to the Commission's expertise and experience (*Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2013 IL App (2d) 120334, ¶ 36), we are unable to say it is "clearly evident" that the inclusion of non-dividend-paying companies in the beta parameter (*via Zacks*) demanded their inclusion in the market-return parameter if a constant-growth DCF model were used to calculate the market return. *Abbott*, 289 Ill. App. 3d at 714.

¶ 81                    B. The Sufficiency of the Commission's Findings and Analysis

¶ 82     Ameren argues that, "at a minimum," we should "remand this case with instructions to the Commission to explain itself." We deem a remand to be unnecessary. The Commission wrote a decision 254 pages long, 38 pages of which were devoted to the cost of equity. For each issue and subissue, the Commission diligently summarized the parties' arguments and chose among the arguments. Its decision "contain[s] findings [and] analysis sufficient to allow an informed judicial review." 220 ILCS 5/10-201(e)(iii) (West 2012).

¶ 83     We realize the Commission denied Ameren's application for a rehearing without providing any explanation for doing so. Nevertheless, we assume that, by the denial, the Commission

- 15 -

adhered to its finding that "the beta estimates provided by [the] Staff [were] more reliable." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 164 (Order Dec. 18, 2013). The Commission's order has enough substance that we can tell whether the "opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Apple Canyon*, 2013 IL App (3d) 100832, ¶ 20. It is not "clearly evident" that Hevert's CAPM analysis is as reliable as Phipps's CAPM analysis, considering that he used only one valid source for his beta, whereas she used multiple sources, and considering that he included non-dividend-paying companies in his constant-growth DCF analysis, whereas she excluded them from her DCF analysis. *Id.*

¶ 84    Ameren purports to be mystified as to why the Commission required the exclusion of non-dividend-paying companies from the market-return parameter, and Ameren complains of the lack of an explanation. Actually, though, as far as we can see, Ameren never has squarely responded to the Commission's stated rationale: that it is impossible to apply a constant-growth DCF model to companies that pay no dividends. See *Connect America Fund*, 28 FCC Rcd. at 7159 n.156 ("The general DCF model cannot be used to calculate the cost of equity for a firm that does not pay dividends."); *Represcribing the Authorized Rate*, 5 FCC Rcd. at 7511 (before "DCF cost of equity calculations" were made, "[t]he S & P 400 group and the electric group were screened to remove *** companies that did not pay quarterly dividends"). Ameren never has explained how the constant-growth DCF formula works when applied to non-dividend-paying companies.

¶ 85                    C. Consumer Protections in the Small Volume Transportation Program
¶ 86                                    1. *Ripeness*
¶ 87    The retail gas suppliers argue that the three consumer protections the Commission required them to provide in the small volume transportation program violate the Public Utilities Act and lack any evidentiary justification.

¶ 88    The Commission responds, initially, that this issue is unripe. According to the Commission, only after it approves the small volume transportation tariffs that Ameren filed in a separate proceeding before the Commission, *Ameren Illinois Co.*, No. 14-0097, will the legitimacy of the consumer protections be ripe for review. Without approved tariffs, there can be no small volume transportation program. The Commission raises the possibility that the program might end up being too expensive to implement. In case No. 14-0097, Ameren disclosed that the costs of the program would be triple the estimate Ameren made previously, in the present case. In light of that disclosure, Ameren requested the Commission, in case No. 14-0097, to enter an "Interim Order and provide further direction confirming whether [Ameren] should proceed with the SVT program."

¶ 89    The retail gas suppliers say, however, that if the Commission decides not to go forward with the small volume transportation program, this will be a change of mind by the Commission, because the Commission already has approved the program. The final order in the present case states: "The Commission concludes that it is in the public interest to approve an SVT program at this time, but with the additional consumer protections ***." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 246 (Order Dec. 18, 2013). The order also states that the Commission is "approving the implementation of an SVT program for [Ameren]." *Id.* at 249. Thus, according to the suppliers, the small volume transportation program is more than a theoretical idea or proposal; it is an approved program. Even though further details need to be worked out in the tariffs, that does not detract from the Commission's

approval of the program, which, by the terms of the order in this case, shall include the consumer protections. The suppliers see a danger that these newfangled consumer protections will be set in concrete, since the order says that "[a]ll issues decided in the instant proceeding will be considered resolved for purposes of the second proceeding." *Id.* at 251. The suppliers are concerned that if we declare their issue to be unripe, the opportunity to challenge the consumer protections will pass and never return: the issue "will be considered resolved." *Id.*

¶ 90 The question of ripeness "is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." (Internal quotation marks omitted.) *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 231 (2004).

¶ 91 The legality of the additional consumer protections is an issue fit for judicial decision. Also, courts commonly determine whether an agency's decision has any support in the evidentiary record.

¶ 92 As for the hardship to the parties of withholding court consideration, the consumer protections could have economic implications for the retail gas suppliers and therefore could affect their decision whether to participate in the small volume transportation program–and could affect their decision whether to participate further in fashioning the program. Because the suppliers presumably will have to make financial commitments in order to fulfill contracts, lengthening the grace periods during which customers could terminate contracts might hurt the bottom line. Keeping track of price data will be time-consuming, and companies do not necessarily want to reveal their pricing strategies to competitors. The suppliers argued to the Commission:

> "Requiring the reporting of the prices and terms of supplier contract offers will be extremely burdensome and provide ambiguous data. Market prices change daily and depending on the business model of an alternative gas supplier, its prices and terms of supplier contract offers may vary daily and may vary for different customers. Tracking this data would entail a huge amount of work for retail gas suppliers and assembling it in a useful format would be a monumental task for [the Citizen Utility Board's Office of Retail Market Development.] *** Additionally, certain supplier contract offers to customers may be sensitive or confidential and in a competitive marketplace a supplier should not be required to expose their pricing strategy to their competitors."

¶ 93 Even at this time, before the small volume transportation program has been implemented, the effects of the additional consumer protections are tangible enough to the retail gas suppliers that the issue is ripe for review. See *id.*

¶ 94                                     2. *The Commission's Authority*
                                    *To Require the Consumer Protections*

¶ 95 The retail gas suppliers challenge the Commission's authority to require them to provide the three consumer protections proposed by the Citizens Utility Board.

¶ 96 Because an administrative agency, such as the Commission, is a creation of the legislature, it has only the powers the legislature gives it in statutory law. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 203 Ill. App. 3d 424, 438 (1990). An act by an agency can be unauthorized in either of two circumstances. One circumstance is the absence of a statute. "The fact that no statute precludes an agency from taking a particular action does not mean that the

authority to do so has been given by the legislature." *Id.* There must be a statute expressly granting the agency the power to do the act in question (*id.*) (and an express grant of power to do the act is interpreted as including the "power to do all that is reasonably necessary to execute the power *** specifically conferred" (*Illinois Federation of Teachers v. Board of Trustees*, 191 Ill. App. 3d 769, 774 (1989))). The other circumstance is the existence of a statute with which the administrative act conflicts. See 220 ILCS 5/10-201(e)(iv)(C) (West 2012) ("The court shall reverse a Commission *** decision, in whole or in part, if it finds that *** [t]he *** decision is in violation of the State *** laws[.]").

¶ 97                                        a. Is There an Empowering Statute?

¶ 98        The first question, then, is whether any statute expressly empowers the Commission to require the observance of administratively created consumer protections as a condition of participating in a small volume transportation program. See *Illinois Bell*, 203 Ill. App. 3d at 438. The answer is yes. The statutory authority comes from sections 9-201 and 19-120(b)(3) of the Public Utilities Act (220 ILCS 5/9-201, 19-120(b)(3) (West 2012)).

¶ 99        Under section 9-201(a) (220 ILCS 5/9-201(a) (West 2012)), whenever a public utility wants to make a significant change, it has to file a "schedule," or tariff, with the Commission. If the utility wants to change "any rate or other charge," it has to file a tariff. *Id.* If the utility wants to change "any rule, regulation, practice[,] or contract relating to or affecting any rate or other charge, classification[,] or service," it has to file a tariff. *Id.* If the utility wants to change "any privilege or facility," it has to file a tariff. *Id.*

¶ 100       Section 9-201(b) says that whenever a utility files a tariff, "the Commission shall have the power, and it is hereby given authority, *** to enter upon a hearing concerning the propriety of such rate or other charge, classification, contract, practice, rule[,] or regulation, and pending the hearing and decision thereon, such rate or other charge, classification, contract, practice, rule[,] or regulation shall not go into effect." 220 ILCS 5/9-201(b) (West 2012).

¶ 101       Section 9-201(c) says that "[i]f the Commission enters upon a hearing concerning the propriety of any proposed rate or other charge, classification, contract, practice, rule[,] or regulation, the Commission shall establish the rates or other charges, classifications, contracts, practices, rules[,] or regulations proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable." 220 ILCS 5/9-201(c) (West 2012). Once the Commission approves a tariff, it "is a law, not a contract, and [it] has the force and effect of a statute." (Internal quotation marks omitted.) *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 55 (2004).

¶ 102       In this case, Ameren filed not only tariffs proposing a general increase in its gas rates but also "rider" or supplemental tariffs proposing the establishment of a small volume transportation program. See 220 ILCS 5/9-201(a) (West 2012) ("new schedules *or supplements*" (emphasis added)). The Commission had the statutory authority to scrutinize the "practices" and "rules" proposed in the small volume transportation tariffs and to find those "practices" and "rules" to be "just and reasonable" only if they included a provision whereby Ameren required retail gas suppliers, as a condition of their participation in the program, to observe certain consumer protections. 220 ILCS 5/9-201(c) (West 2012).

¶ 103       Section 19-120(b)(3) provides: "The Commission shall have jurisdiction *** to investigate *** whether *** the alternative gas supplier has violated or is in nonconformance with the

transportation services tariff of, or any of its agreements relating to transportation services with, the gas utility *** providing transportation services ***." 220 ILCS 5/19-120(b)(3) (West 2012).

¶ 104　　We conclude, therefore, that statutory law (1) authorizes the Commission to require the inclusion of consumer protections in a small volume transportation tariff and (2) gives the Commission "jurisdiction" over retail gas suppliers to investigate their compliance with these consumer protections.

¶ 105　　The retail gas suppliers point out that the three consumer protections are not actually in any of the proposed small volume transportation tariffs that Ameren has filed. Nevertheless, the import of the Commission's order is that the three consumer protections *shall* be in Ameren's small volume transportation tariff. After all, this administrative case was a hearing on tariffs. The Illinois Competitive Energy Association (ICEA) and the Retail Energy Supply Association (RESA) must have contemplated that if the Commission adopted the consumer protections proposed by the Citizens Utility Board, the protections would be in the small volume transportation tariff. They argued to the Commission: "ICEA/RESA says [the Citizens Utility Board] is under the misunderstanding that the tariffs of Illinois gas utilities are the only source of consumer protections. *** ICEA/RESA states that protections for residential and small-volume non-residential natural gas customers are set forth in Section 19-115 of the Act [(220 ILCS 5/19-115 (West 2012))]." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 245 (Order Dec. 18, 2013).

¶ 106　　　　　　　　b. Do the Three Consumer Protections Violate Statutory Law?
¶ 107　　　　　　　　　　i. *The First Consumer Protection*
¶ 108　　The first consumer protection that the Commission approved in this case provides as follows:

> "(1) A customer shall be absolved from paying any termination fees if, prior to the due date of their first bill, they notify the supplier that they are terminating the contract." *Id.* at 247.

¶ 109　　The retail gas suppliers argue that because this consumer protection requires a grace period "different from" the grace period in section 19-115(g)(5)(B) of the Public Utilities Act (220 ILCS 5/19-115(g)(5)(B) (West 2012)), it "directly conflict[s] with" that statute. Section 19-115(g)(5)(B) reads as follows:

> "(g) An alternative gas supplier shall comply with the following requirements with respect to the marketing, offering, and provision of products or services:
> 　　　　　　　　* * *
> (5) Early Termination.
> 　　***
> (B) In any agreement that contains an early termination clause, an alternative gas supplier shall provide the customer the opportunity to terminate the agreement without any termination fee or penalty within 10 business days after the date of the first bill issued to the customer for products or services provided by the alternative gas supplier. The agreement shall disclose the opportunity and provide a toll-free phone number that the customer may call in order to terminate the agreement." 220 ILCS 5/19-115(g)(5)(B) (West 2012).

Thus, if a contract between an alternative gas supplier and a customer includes a provision governing an early termination of the contract, the contract must inform the customer that the customer has the right to terminate the contract, without penalty, within 10 business days after the first bill is issued to the customer. Also, the contract has to provide a toll-free telephone number the customer may call to exercise this right of early termination.

¶ 110   The alternative gas suppliers complain that the grace period the Commission ordered in the first consumer protection is longer than the grace period that section 19-115(g)(5)(B) "allow[s]." Again, the first consumer protection provides that a customer may terminate the contract, without penalty, before the *due date* of the first bill. Under the Commission's rules, "[b]ills for residential customers shall be due a minimum of 21 days after the date they are sent to the customer, and bills for non-residential customers shall be due a minimum of 14 days after the date they are sent to the customer." 83 Ill. Adm. Code 280.50(e)(1), adopted at 38 Ill. Reg. 21331 (eff. Nov. 1, 2014). Thus, the first consumer protection lengthens the grace period from 10 days after the issuance of the first bill to a minimum of 21 days after the issuance of the first bill for residential customers and a minimum of 14 days after the issuance of the first bill for nonresidential customers.

¶ 111   According to the retail gas suppliers, this substitution of a longer grace period for the shorter grace period in the statute is an unauthorized act, like the Commission's violation of section 9-230 (220 ILCS 5/9-230 (West 1994)) in *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 283 Ill. App. 3d 188 (1996). Section 9-230 provided:

> " 'In determining a reasonable rate of return upon investment for any public utility in any proceeding to establish rates or charges, the Commission shall not include *any* incremental risk or increased cost of capital which is the *direct or indirect* result of the public utility's affiliation with unregulated or nonutility companies.' " (Emphases in original.) *Illinois Bell*, 283 Ill. App. 3d at 205 (quoting 220 ILCS 5/9-230 (West 1994)).

Illinois Bell Telephone Company (Illinois Bell) was affiliated with Ameritech Corporation (Ameritech), and "[instead of] determining whether [Illinois] Bell's risk or capital costs were greater because of its affiliation with Ameritech, the Commission merely determined [that Illinois] Bell's capital structure was reasonable." *Id.* at 207. If, however, the affiliation with Ameritech caused Illinois Bell to be a riskier investment than it otherwise would have been, the supposed reasonableness of the affiliation was irrelevant; the statute flatly forbade using the added risk as a justification for allowing Illinois Bell a higher rate of return. The appellate court said:

> "In section 9-230, the legislature used the word 'any' to modify its prohibition of considering incremental risk or increased cost of capital in determining a reasonable [rate of return]. This usage removes all discretion from the Commission. Section 9-230 does not allow the Commission to consider what portion of a utility's increased risk or cost of capital caused by affiliation is 'reasonable' and therefore should be borne by the utility's ratepayers; the legislature has determined that any increase whatsoever must be excluded from the [rate-of-return] determination. It is impermissible for the Commission to substitute its reasonableness standard for the legislature's absolute standard." *Id.*

The statutory phrase "shall not include any incremental risk" was an absolute prohibition.

¶ 112   The statute before us, section 19-115(g)(5)(B) of the Public Utilities Act (220 ILCS 5/19-115(g)(5)(B) (West 2012)), would be more comparable to the statute in *Illinois Bell* if it

said something to the effect of: "The agreement *shall not include any* grace period other than a period of 10 business days after the issuance of the first bill." But that is not what section 19-115(g)(5)(B) says. Instead, it says that the alternative gas supplier "shall provide the customer the opportunity to terminate the agreement without any termination fee or penalty within 10 business days after the [issuance] of the first bill." *Id.* If the supplier provides the customer the opportunity to terminate the agreement within, say, 14 business days after the issuance of the first bill, then, *ipso facto*, the supplier would provide the customer the opportunity to do so within 10 business days after the issuance of the first bill. A longer period encompasses a shorter period. If the deadline for early termination is the fourteenth day and the customer calls on the tenth day, the supplier surely will not regard the call as ineffectual and require the customer to call back in four days. By giving the customer the opportunity to terminate the contract within 14 days, the supplier gives the customer the opportunity to do so on the first day, the second day, the third day, etc., all the way up to day 14.

¶ 113    The alternative gas suppliers argue, however, that if the legislature really intended to allow a grace period of longer than 10 business days, the legislature could have used a modifier such as "no less than" or "at least": "An alternative gas supplier shall provide the customer the opportunity to terminate the agreement without any termination fee or penalty within *no less than* 10 business days after the date the first bill was issued to the customer." True–or the legislature could have spoken in terms of an "opportunity" to terminate the contract. The best evidence of legislative intent is the plain and ordinary sense of the words the legislature used (*Paris v. Feder*, 179 Ill. 2d 173, 177 (1997)), and in the plain and ordinary sense of words, when someone is given an "opportunity" to do something within a period of longer than 10 days, the person necessarily is given the "opportunity" to do it within 10 days. Hence, in our *de novo* interpretation (see *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 508 (2004)), we conclude that section 19-115(g)(5)(B) of the Public Utilities Act (220 ILCS 5/19-115(g)(5)(B) (West 2012)) does not forbid the Commission to prescribe a grace period longer than 10 business days after the issuance of the first bill.

¶ 114                              ii. *The Second Consumer Protection*

¶ 115    The second consumer protection likewise lengthens the grace period for the early termination of a contract, making the grace period especially long if the contract was preceded by a door-to door solicitation:

> "2. When a customer has accepted service from a supplier after solicitation by a door-to-door salesperson, there shall be no termination fees assessed if the customer terminates during the first 6 billing cycles." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 247 (Order Dec. 18, 2013).

¶ 116    The retail gas suppliers make essentially the same argument against the second consumer protection that they make against the first consumer protection: under section 19-115(g)(5)(B) (220 ILCS 5/19-115(g)(5)(B) (West 2012)), "ten days means ten days, regardless of how a customer was solicited." In our discussion of the first consumer protection, we explained why we disagree with that argument. For the same reason, we disagree with the suppliers' argument against the second consumer protection.

¶ 117                              iii. *The Third Consumer Protection*

¶ 118          The third consumer protection provides as follows:

> "3. If a supplier's marketing materials include a price comparison of the supplier
> rate and the gas utility rate, the depiction of such comparison shall display at least three
> years of data in no greater than quarterly increments and shall also display the
> supplier's offered price for the same or equivalent product(s) or service(s) for each of
> the same increments." *Ameren Illinois Co.*, Ill. Com. Comm'n No. 13-0192, at 247
> (Order Dec. 18, 2013).

¶ 119          The retail gas suppliers make essentially two arguments against this consumer protection. First, nothing in the Public Utilities Act authorizes the Commission to order this consumer protection. Second, this consumer protection "directly conflicts with" sections 19-115(g) and 19-125(c) of the Public Utilities Act (220 ILCS 5/19-115(g), 19-125(c) (West 2012)), in the sense that "the expression of one thing in an enactment excludes any other, even if there are no negative words prohibiting it." *Illinois Bell*, 203 Ill. App. 3d at 438. We will address each of those arguments in turn.

¶ 120                              (a) Statutory Authorization

¶ 121          As we have discussed, when the Commission holds an administrative hearing on a tariff filed by a utility, section 9-201(c) empowers the Commission to "establish" "just and reasonable" "practices, rules[,] or regulations" "in lieu" of those the utility has proposed in the tariff. 220 ILCS 5/9-201(c) (West 2012). Thus, if the third consumer protection is just and reasonable, the Commission has the power to establish it as a practice, rule, or regulation in Ameren's small-volume transportation tariff.

¶ 122                              (b) The Argument of Implied Exclusion

¶ 123          The retail gas suppliers argue that the third consumer protection "directly conflicts with provisions in the [Public Utilities Act] that address marketing practices and price comparisons." The only such provisions the suppliers cite are sections 19-115(g) and 19-125(c) (220 ILCS 5/19-115(g), 19-125(c) (West 2012)). The suppliers do not explain how the third consumer protection requires them to do anything that sections 19-115(g) and 19-125(c) forbid.

¶ 124          Perhaps the suppliers mean that sections 19-115(g) and 19-125(c) impliedly exclude the third consumer protection. Expressing one thing in a statute *can* impliedly exclude another thing, but it does not always do so. If the statement "the expression of one thing in an enactment excludes any other" were taken at face value, there could be only one enactment. *Illinois Bell*, 203 Ill. App. 3d at 438. Actually, the exclusionary implication is heavily dependent on context and common sense. In *Illinois Bell*, for example, the only reasonable inference from section 9-244 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. $111^2/_3$, ¶ 9-244) was that the legislature did not intend the Commission to unilaterally implement incentives to improve utility performance, because the statute authorized the Commission to do a study on the necessity and desirability of an incentive program and then to report its findings to the legislature, " 'with appropriate legislative recommendations.' " (Emphasis omitted.) *Illinois Bell*, 203 Ill. App. 3d at 437-38 (quoting Ill. Rev. Stat. 1989, ch. $111^2/_3$, ¶ 9-244). Because the legislature wanted the Commission to study the question and then make

its recommendations to the legislature, the clear implication was that the legislature had reserved to itself the decision of whether to have an incentive program for utilities.

¶ 125 We find no comparable exclusionary implication in either section 19-115(g) (220 ILCS 5/19-115(g) (West 2012)) or section 19-125(c) (220 ILCS 5/19-125(c) (West 2012)). Section 19-115(g) says only this about marketing materials: "Any marketing materials which make statements concerning prices, terms, and conditions of service shall contain information that adequately discloses the prices, terms[,] and conditions of the products or services." 220 ILCS 5/19-115(g)(1) (West 2012). We do not understand by what logic this statute impliedly excludes the third consumer protection, which governs marketing materials that purport to make "a price comparison of the supplier rate and the gas utility rate."

¶ 126 As for section 19-125(c) (220 ILCS 5/19-125(c) (West 2012)), it has nothing to do with marketing. Rather, it requires alternative gas suppliers to provide the Commission their pricing information, which the Commission then will post on the Internet so that customers can compare the prices of the various suppliers. It is unclear how this statute could be interpreted as impliedly saying no to something quite different: a regulation governing marketing materials that purport to compare the supplier's rate to the gas utility's rate.

¶ 127 ### 3. *The Lack of an Opportunity To Present Rebuttal Evidence*

¶ 128 The retail gas suppliers complain that "[b]ecause [the Citizens Utility Board proposed the three consumer protections] in the rebuttal phase of the case, there was no additional round of testimony during which [the suppliers] could have addressed those issues."

¶ 129 Nevertheless, as the Commission notes, the suppliers did not object when, during the rebuttal phase, Cohen proposed the three consumer protections. According to the Commission's brief, "his evidence was admitted into the administrative record without objection." The suppliers could have objected during Cohen's testimony. They could have objected that by waiting until the rebuttal phase to propose these new rules, the Citizens Utility Board deprived them of the opportunity to respond with evidence that the proposed new rules would be too burdensome or too costly. Then the administrative law judge could have sustained their objection or, alternatively, could have modified the schedule so as to allow them to present surrebuttal evidence. But the suppliers made no contemporaneous objection.

¶ 130 A rule of the Commission provides: "Objections must be made at hearing to preserve them on appeal." 83 Ill. Adm. Code 200.610(b) (2000). Pursuant to that rule, we conclude that the suppliers have forfeited their procedural objection to the proposal of new rules during rebuttal.

¶ 131 ### 4. *The Argument That the Three Consumer Protections*
### *Lack Evidentiary Support in the Record*

¶ 132 The Commission found that "in light of the experience in [n]orthern Illinois, the three requirements proposed by [the Citizens Utility Board were] reasonable and appropriate supplements to the existing statutory protections," and therefore the Commission "adopted" them. The suppliers argue that, for all that appears in the record, "the experience in [n]orthern Illinois" consists merely of two cases, one from 2002 and the other from 2008, and that these two isolated cases from years ago, which did not even occur in Ameren's service territory, cannot reasonably serve as a basis for the three consumer protections. Thus, the suppliers argue, "[t]he findings of the Commission are not supported by substantial evidence based on

the entire record of evidence presented to or before the Commission for and against such rule, regulation, order[,] or decision." 220 ILCS 5/10-201(e)(iv)(A) (West 2012).

¶ 133 Let us assume, for the sake of argument, that the suppliers are correct: if the aim is to respond to historical abuses, the two cases from northern Illinois cannot reasonably serve as a justification for the three consumer protections. Let us say these cases are too few and too stale to be the basis for any decision.

¶ 134 It does not necessarily follow that the three consumer protections are "[un]just and [un]reasonable." 220 ILCS 5/9-201(c) (West 2012). The suppliers cite no case holding that the Commission must be purely reactive, and never proactive, in the practices, rules, and regulations it requires in tariffs. They cite no case holding that consumers must be exploited in sufficient numbers before measures can be taken to protect them. To borrow an analogy from the Commission's brief, the Commission should not have to wait until someone is run over by a train before it declares a railroad crossing to be dangerous. See *Galt v. Illinois Commerce Comm'n*, 28 Ill. 2d 501, 504 (1963).

¶ 135 Section 9-201(c) requires that the "practices, rules[,] or regulations" in tariffs be "just and reasonable," not that they be validated by a compelling history of abuses. 220 ILCS 5/9-201(c) (West 2012). The Commission could reasonably foresee the potential for unfairness, deception, or exploitation and, by the insertion of a rule or regulation into the tariff, try to prevent the wrong from ever happening.

¶ 136                                   III. CONCLUSION
¶ 137 For the foregoing reasons, we affirm the Commission's decision.

¶ 138 Affirmed.

¶ 139 JUSTICE STEIGMANN, concurring in part and dissenting in part.
¶ 140 With one small exception, I agree completely with the sound majority opinion. That small exception pertains to one of the three additional consumer protections the Commission added, providing that a customer shall be absolved from paying any termination fees if, prior to the due date of the customer's first bill, the customer notifies the supplier that the customer is terminating the contract. The retail gas suppliers argue that because this consumer protection requires a grace period that is different from the one provided in section 19-115(g)(5)(B) of the Public Utilities Act (220 ILCS 5/19-115(g)(5)(B) (West 2012)), it directly conflicts with that statute. I agree with that analysis and respectfully dissent from that portion of the majority's opinion.

¶ 141 The majority opinion sets forth section 19-115(g)(5)(B) of the Public Utilities Act in its entirety (see *supra* ¶ 109), so I will not repeat that section here. In my judgment, that section constitutes a legislative determination regarding the time in which any agreement that contains an early termination clause may be subject to an early termination. The legislature has decided that the customer may terminate the agreement without any termination fee or penalty *within 10 business days* after the date of the first bill issued to the customer for products or services provided. Contrary to the majority opinion, I view this language as constituting a definitive legislative judgment that is binding upon the Commission. Accordingly, the Commission

exceeded its lawful authority by purporting to extend the time for early termination beyond that contained in section 19-115(g)(5)(B) of the Public Utilities Act.