AMAX ZINC COMPANY, INC., *et al.*, Plaintiffs-Appellants, *v.* ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees. (Union Electric Company, Plaintiff-Appellee, *v.* Illinois Commerce Commission, Defendant-Appellee).

Fifth District    No. 83—151

Opinion filed May 2, 1984.

Randall Robertson and Edward C. Fitzhenry, both of Lueders, Robertson & Konzen, of Granite City, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Edward P. O'Brien, Assistant Attorney General, and Hercules F. Bolos, Special Assistant Attorney General, of counsel), for appellee Illinois Commerce Commission.

Paul A. Agathen, of St. Louis, Missouri, and Robert Broderick, of Pope & Driemeyer, of Belleville, for appellee Union Electric Company.

JUSTICE JONES delivered the opinion of the court:

This is an appeal of an order of the circuit court of Madison County that affirmed two orders of the Illinois Commerce Commission establishing revised power rates charged the appellants and other customers of the system. The appellants are Amax Zinc Company, Inc., Cerro Cooper Products, a Member of the Marmon Group, Chemetco, Inc., Clark Oil and Refining Corporation, Laclede Steel Company,

Monsanto Company and Owens-Illinois, Inc. All are industrial customers purchasing electric power from Union Electric Company (UE) and were intervenors before the Illinois Commerce Commission (Commission) in UE's rate revision proceeding and will be referred to as Intervenors. The rate revision proceeding was begun on May 22, 1980, when UE filed a tariff of proposed increased rates with the Commission. Pursuant to section 36 of "An Act concerning public utilities" (Ill. Rev. Stat. 1979, ch. 111²/3, par. 36), the Commission suspended the proposed rates and conducted hearings to inquire into their reasonableness. Appellants and others were granted permission to intervene. On April 15, 1981, the Commission issued an order approving certain increases, though not as requested by UE, and directed UE to file a revised tariff consistent with its order, to become effective for service rendered on and after the day subsequent to the date of filing of the revision. That date was April 18, 1981.

The orders that were before the circuit court, and that are the subject of this appeal, were those of April 15, 1981, which granted UE a rate revision and increase, and October 14, 1981, which denied the Intervenors' applications for rehearing. The single issue presented to the circuit court, and in this appeal, is whether the two orders of the Commission constituted the approval of retroactive rates for primary service (applicable to all Intervenors except Amax) and interruptible power rates (applicable to Amax only) by implementing a 100% ratchet based upon the highest electric consumption demands made by Intervenors in the months of June through September 1980, as to primary service customers, and in 1977, as to interruptible power customers.

Essential to an understanding of the issues of the case is some acquaintance with the term "ratchet." The term "ratchet" is a metaphor, idiomatic to the utility ratemaking industry, used to describe a rate device that ties a monthly billing for "demand cost" to the customer's highest historical consumption for a given period. "A ratchet provision serves to put a floor under the maximum demand for billing purposes, and may hold the billing demand to no less than the highest demand recorded in some stated past period or some percentage thereof." P. Garfield and W. Lovejoy, Public Utility Economics 157 (1964).

According to a publication of the United States Department of Energy, A Consumer's Guide to the Economics of Electric Utility Ratemaking 124-25 (1980), the costs that an electric utility incurs are of three basic types:

"1) *Energy Costs*: The operating expenses incurred by a util-

ity on behalf of an individual customer in providing that customer with a kilowatt hour (KWH) of electric energy. Energy costs vary directly with KWH usage and are primarily fuel costs.

2) *Customer Costs*: The capital and operating expenses incurred by the utility on behalf of an individual customer relating primarily to the number and size (usage) of customers. Customer cost does not vary significantly with the amount of energy used.

3) *Demand/Capacity Cost*: The capital and operating expenses incurred by a utility on behalf of an individual customer in providing sufficient capacity (a large enough generation, transmission and distribution system) to meet the maximum demand of that customer when needed."

Roughly paralleling this classification is language from section 32 of "An Act concerning public utilities" (Ill. Rev. Stat. 1979, ch. 111²/₃, par. 32) providing that as a basis of the charges made by it, a utility may classify its service "according to the amount used, the time when used, the purpose for which used, and other relevant factors."

The ratchet provision in question relates to the charge of the utility for providing sufficient electric generating capacity to meet the peak demand, or consumption rate, of an individual customer. That capacity is the element of rates described in number 3 of the Department of Energy publication set forth above. The cost to the utility for its plant, its equipment and other of its capital outlays required to be made on behalf of individual customers, such as the Intervenors here, is passed on to those customers by a rate that is based upon what the maximum need of that customer for electricity has been. That portion of the total rate is termed a demand charge. Our supreme court expressly approved a demand charge as an element of an electric rate in *Antioch Milling Co. v. Public Service Co.* (1954), 4 Ill. 2d 200, 207, 123 N.E.2d 302, 306, as follows:

"A demand charge is designed to allocate to a utility's customers their fair portion of those fixed costs which must be incurred by the utility regardless of the amount of power which is actually supplied. It is the price which must be paid for the construction and maintenance of a plant with sufficient capacity to satisfy its customers' demands. Such a charge for the utility's readiness to serve is proper."

The October 14, 1981, order of the Commission discusses the purpose of a ratchet provision in ratemaking:

"The use of the 100% ratchet, proposed by the company [UE]

for its primary service rate customers, is in fact a device which promotes conservation and the efficient use of energy. \*\*\* In addition, ratchet provisions historically have been utilized to ensure that each customer within the class contributes a fair share of the costs incurred by the utility in providing the capacity or demand required."

The Intervenors do not attack the ratchet or its use as a component of rates, for they state in their brief:

"The purpose of a demand ratchet provision is to provide a prospective price signal to a customer and to minimize the demand for electric energy during an *on-peak* period when the utility's reserve margins are generally the slimmest and to encourage the demand for electric energy during the off-peak period when the utility has a sufficient generating capacity already in place. When the price signal is given prospectively through a demand ratchet, the customer can take power without regard to cost or make the choice of minimizing his electric energy costs by either reducing his on-peak demand or by increasing his off-peak demand. The result desired is a more efficient utilization of power and power facilities by the customers and by the utility. If the price signal is not given prospectively, the customer has no power to respond."

The Intervenors' posture thus expressed is attuned to the purpose for which the ratchet was designed.

"Although a ratchet is, initially, customer-focused, like demand allocation, it is also designed to bring about a more efficient system by providing an economic incentive for individual customers to level their yearly demand. By encouraging customers to spread their load more evenly, the utility seeks to improve its load distribution, *i.e.*, to eliminate periodic excess capacity." *City of Batavia v. Federal Energy Regulatory Com.* (D.C. Cir. 1982), 672 F.2d 64, 83.

The demand charges in question are contained in UE's Service Classification No. 4 (I), Primary Service Rate, and Service Classification No. 7(I), Interruptible Power Rate. Excerpts from those rates will suffice to illustrate for statement of the Intervenors' position:

"Primary Service Rate 4(I)

| | |
|---|---|
| Customer Charge | $150.00 per month |
| Demand Charge | $ 5.30 per kW |
| Energy Charge | 1.40¢ per kWh |

\* \* \*

5. *Billing Demand.* The billing demand in any month shall be

8

the highest billing demand established during the 12 months ending with the current month. In computing the billing demand the higher of (1) 100% of the highest demand established during peak hours or (2) 50% of the highest demand established during off-peak hours shall be used, but in no event will the billing demand be less than 150 kW.

On-peak hours:   10:00 AM - 10:00 PM Monday through Friday during the calendar months of June through September.

Off-peak hours:   All other hours including the entire 24 hours of Independence Day and Labor Day.

All times stated above apply to the local effective time.

* * *

Interruptible Power Rate 7(I)

3. *Rate Based on Monthly Meter Readings.*

Customer Charge                                    $150.00 per month
Energy Charge                                      1.40¢ per kWh (1)
Demand Charge - Assurance Power        $5.30 per kW (2)
                       - Interruptible Power    $2.27 per kW (3)
Fuel Rider (Rider A) - Applicable to all kWh.

* * *

(3) The kilowatts to be billed as Interruptible Power will be the highest demand established at any time less the currently applicable kilowatts of Assurance Power."

The billing for the demand or capacity cost in the Primary Service Rate that was in effect prior to the rate filing under consideration here provided that the billing for demand was to be based on 50% of the highest demand in that month only and set the "on peak" and "off peak" periods on a daily basis without regard to any seasonal period of time. Under that scheme the demand made of the system in prior months did not affect and was not applied to the current month's bill.

Under the Interruptible Power Rate in effect prior to April 18, 1981, Amax was subject to a charge for demand of $2.40 per kW per month for assurance or firm power only. No charge for demand was applicable for interruptible power use. Under the new rates effective April 18, 1981, as shown by Service Classification 7(I) above, a charge for demand was made applicable to the interruptible portion of power consumption. The basis of this interruptible power demand charge is the highest demand established at any time. In the case of Amax, the historically highest consumption had occurred in 1977.

The ratchet in the primary service classification is found in its provision that the billing for demand (capacity) in any month shall be the highest demand established during the 12 months ending with the current month. The billing for demand (capacity) is the higher of (1) 100% of the highest demand established during "on peak hours," or (2) 50% of the highest demand during "off-peak hours." "On-peak hours" are defined to be 10 a.m. through 10 p.m. Monday through Friday during the calendar months of June through September. "Off-peak hours" are defined as all others, but also including the Independence Day and Labor Day holidays.

Thus, under the old rates in effect prior to April 18, 1981, the demand imposed upon the system in prior months did not affect the current months' bill. The ratchet provision in the new rate approved by the Commission to be effective April 18, 1981, changed the demand billing to incorporate prior demands placed on the system. In implementing the new rates, UE billings to Intervenors after April 18, 1981, indicated that the peak demand placed on the system by each customer during the summer of 1980 was used for the purpose of determining the "on-peak demand" charge for those customers. As to Intervenor Amax under the new Interruptible Power Rate, UE billings after April 18, 1981, indicated that 1977 was used as the historical high demand for the billing for demand.

The retroactive incorporation of 1980 peak demand for current monthly billings is the basis of Intervenors' position before the Commission on rehearing, before the circuit court and before this court. They argue that rates approved by the Commission must be prospective in their operation, citing *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, 117 N.E.2d 774. They further argue that the purpose of a demand ratchet is to enable a user of electricity subject to a demand charge to adjust its use during the "on-peak" hours so as to make its maximum use or demand at an "off-peak" period and thereby minimize both its charges and the demand on the capacity of the generating system. The new rates incorporating the ratchet as approved wholly denied the Intervenors any opportunity to organize their use of electricity so as to maximize it during the "off-peak" period. Intervenors finally argue that while the orders of the Commission of April 18, 1981, and October 14, 1981, approve a 100% ratchet for the rate for demand, neither of those orders authorize, or even acknowledge, use of 1980 demand peaks for the billing for demand in 1981. Furthermore, Intervenors say, no finding of facts, as required by statute, are made in either order of the Commission that would justify UE in using 1980 demand peaks for billing

for demand in 1981. Such action by UE is therefore arbitrary, unreasonable and unjust, and accordingly void.

We must disagree with the Intervenors' position and arguments and affirm the order of the circuit court that affirmed the April 18, 1981, and October 14, 1981, orders of the Commission. In doing so we initially acknowledge the expertise of the Commission in performing its role in fixing rates for utilities. The supreme court has on many occasions noted a deference to the Commission in such matters as are presented by this case. For instance, in *Cerro Cooper Products v. Illinois Commerce Com.* (1980), 83 Ill. 2d 364, 370-71, 415 N.E.2d 345, 348, the court stated that reviewing courts are empowered "only to consider whether the Commission has acted within the scope of its authority, whether any constitutional right has been infringed, and whether its findings are founded on the evidence (*Killarney Water Co. v. Illinois Commerce Com.* (1967), 37 Ill. 2d 345; *Champaign County Telephone Co. v. Illinois Commerce Com.* (1967), 37 Ill. 2d 312). An order of the Commission will be presumed to be valid (*Village of Maywood v. Illinois Commerce Com.* (1961), 23 Ill. 2d 447, cert. denied (1962), 369 U.S. 851, 8 L. Ed. 2d 10, 82 S. Ct. 935) and may not be set aside unless it is clearly contrary to the manifest weight of the evidence (Ill. Rev. Stat. 1979, ch. 111²/₃, par. 72; *McMann v. Illinois Commerce Com.* (1967), 38 Ill. 2d 126; *Village of Apple River v. Illinois Commerce Com.* (1960), 18 Ill. 2d 518). In the area of setting utility rates courts have generally deferred to the Commission's expertise. (*Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 436; *Brinker Trucking Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 354.)"

However, our deferral to the ratemaking expertise of the Commission does not mark the extent of our consideration. After examination of the record, the authorities and the arguments, we are persuaded that the Commission has not approved retroactive rates on behalf of UE. The Intervenors have cited no authority that directly supports their contention that the use of the 1980 ratchet constituted retroactive application. In fairness, we must also state that, on the other hand, there is little authority for the proposition that the use of the 1980 ratchet in question does not constitute retroactive ratemaking. Both UE and the Commission cite *Re Commonwealth Edison Co.* (1982), 46 PUR 4th 498. It is not clear from the report of that case conducted before the Federal Energy Regulatory Commission just what the basis of the retroactive ratemaking argument was. However, it appears that certain municipalities, wholesale electric customers of Commonwealth Edison Company, argued that inclusion of a 100%

ratchet in newly filed rates constituted retroactive application of Commonwealth's new rate design. In disposing of that argument the Commission stated:

> "With respect to the demand ratchet, the argument that Commonwealth has improperly engaged in 'retroactive rate making' is misplaced. By including a demand ratchet based upon the four summer months of the preceding 12-month period, Commonwealth is neither retroactively altering the rates previously charged to its customers nor presently charging rates other than those currently on file with the commission." (46 PUR 4th 498, 501.)

The Commission, without discussing why or why not, merely held that Commonwealth had neither retroactively altered rates nor was presently charging rates other than those currently on file. Under such circumstances, the case cannot be considered persuasive precedent.

Although it was somewhat informal and unofficial, the Intervenors nevertheless did receive notice in May 1980 from UE that they were incorporating the very ratchet provision that the Commission later approved. That notice was contained in copies of the proposed rates as filed with the Commission in May 1980 that were mailed to Mr. Brubaker, a rate consultant for Intervenors. Also, in June 1980, UE's manager of rate engineering attended a meeting of the Southwestern Illinois Industrial Association and explained the ratchet provisions of rates 4 and 7, including a statement that billing for demand would be based on demands experienced during the summer of 1980. Industrial power users were broadly represented at that meeting. Also, at the hearings before the Commission, the same Mr. Brubaker, testifying on behalf of the Intervenors, recommended that the ratchet be fixed at 70% of the previous 12 months' experience, rather than at the 100% contained in the rates. This reflects both foreknowledge and consideration of the 1980 basis for the ratchet.

Billings for demand made to individual customers are the sum of a demand charge that is calculated to reflect the individual customers' share of demand costs. The intervenors now before the court are six of 75 industrial customers subject to rate 4(I). The general aim of rate design is to enable a utility to recover allowable revenues by charging customers rates that reflect the total costs of providing service. The statutory mandate is that rates be just and reasonable. However, the mandated norm is not easily attainable. The ratemaking process is lacking in precision and is not an exact science. That fact has been recognized on several occasions by our supreme court, for example in *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com.* (1960), 19

Ill. 2d 436, 442, 167 N.E.2d 414, 417, where they said:

> "We have long held that the decision of the Commission is entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience. *Village of Apple River v. Commerce Com.* 18 Ill. 2d 518, 523; *Public Utilities Com. ex rel. City of Springfield v. Springfield Gas & Electric Co.* 291 Ill. 209.
>
> This deference to the judgment of the Commission is especially appropriate in the area of fixing rates. Quoting from the *Springfield Gas Co. case,* we said in *Produce Terminal Corp. v. Commerce Com. ex rel. Peoples Gas Light & Coke Co.* 414 Ill. 582, 590: 'A just and reasonable rate, therefore, is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. *** Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before.'
>
> The power to make rates, of necessity, requires the use of pragmatic adjustments which may be called for by the particular circumstances. (*Federal Power Com. v. Hope Natural Gas Co.* 320 U.S. 591, 602, 88 L. ed. 333, 344; *Federal Power Com. v. Natural Gas Pipeline Co.* 315 U.S. 575, 586, 86 L. ed 1037, 1050.) This, of course, does not mean that the Commission may ignore pertinent factors affecting the rate structure."

Also see *Citizens Utilities Co. v. Illinois Commerce Com.* (1971), 50 Ill. 2d 35, 276 N.E.2d 330.

"Sound business judgment," "reasonableness of conduct" and "pragmatic adjustments" we find to be touchstones that guide us to the conclusion that UE has not in this instance engaged in, and the orders of the Commission have not sanctioned, retroactive ratemaking. Our approval is given without equivocation for, in the final analysis, the rates being charged in the billing for demand are those that are currently on file and approved by the Commission and that are applicable only to services rendered after the effective dates of the new rates. That they incorporate a use factor derived from a period prior to the rates being filed cannot serve to avoid the use of the 100% ratchet in its entirety for a period of 12 months from April 18, 1981. The summer 1980 peak consumption figures are, after all, not spurious, but a matter of historical fact. Although one of the purposes of the use of a ratchet, the opportunity to avoid "on-peak" consumption by large industrial users, may not be fulfilled for a short time, this should not render the rate design incorporating the 100% ratchet

retroactive ratemaking. We hold that it is not. In the absence of this result the 100% ratchet could not become effective as to Intervenors until after April 18, 1982, with consequent disruption to the revenues of the company, authorized by the Commission order, as well as an unwarranted burden on the other industrial customers of UE. Neither the old rates, nor any other, may be substituted for the rates on file and approved by the Commission. Ill. Rev. Stat. 1979, ch. 111⅔, par. 37.

Finally, we disagree with the Intervenors' contention that the order of the Commission never approved the use of 1980 consumption levels as the basis of the 100% ratchet. The order of October 14, 1981, entered following rehearing, provided:

> "The Commission is of the opinion that the Primary Service Rate (Rate 4) and the Interruptible Power Rate (Rate 7) (Industrial Intervenors' Exhibits 1 and 2 on Rehearing) effective April 18, 1981, appropriately implement the 100% ratchet contemplated and approved by the Commission [sic] [Order] of this Commission entered April 15, 1981, in this cause.
>
> * * *
>
> The Order of the Commission entered April 15, 1981, directed the effective date to be '. . .on and after the day subsequent to the date of filing same with this Commission.' If the rate schedules filed April 18, 1981, were not, in the opinion of the Commission, in conformity with the order entered April 15, 1981, this Commission could have suspended same prior to the effective date under the provisions of Section 36. The discretion to act or not act, within 30 days from the time of filing or such lesser time as is determined appropriate, is vested in the Commission.
>
> In the instant case, this Commission is of the opinion that no further inquiry was needed concerning the propriety of the rates filed on April 18, 1981[,] by the Company in response to the Order entered April 15, 1981."

While neither of the orders under review mention 1980 consumption levels in connection with the 100% ratchet, they also leave no room for doubt that 1980 consumption levels were the point of reference for the 100% ratchet.

Affirmed.

KARNS and HARRISON, JJ., concur.