# Illinois Official Reports

## Appellate Court

---

**Citizens Utility Board v. Illinois Commerce Comm'n, 2018 IL App (1st) 170527**

---

| | |
|---|---|
| Appellate Court Caption | CITIZENS UTILITY BOARD; PRAIRIE FARMS DAIRY, INC.; UNITED STATES STEEL-GRANITE CITY WORKS; and THE UNIVERSITY OF ILLINOIS, Appellants, v. THE ILLINOIS COMMERCE COMMISSION and ILLINOIS-AMERICAN WATER COMPANY, Appellees. |
| District & No. | First District, Second Division<br>Docket Nos. 1-17-0527, 1-17-0561 cons. |
| Filed | September 11, 2018 |
| Decision Under Review | Appeal of order of Illinois Commerce Commission, No. 16-0093. |
| Judgment | Affirmed. |
| Counsel on Appeal | Julie L. Soderna and Kelly A. Turner, of Chicago, for appellant Citizens Utility Board.<br><br>Eric Robertson and Ryan Robertson, of Leuders, Robertson & Konzen LLC, of Granite City, for appellant Prairie Farms Dairy, Inc.<br><br>Thomas R. Stanton, Special Assistant Attorney General, of Chicago, for appellee Illinois Commerce Commission.<br><br>Albert D. Sturtevant, Anne M. Zehr, and Nikhil Vijaykar, of Whitt Sturtevant LLP, of Chicago, and Kenneth C. Jones, of Belleville, for appellee Illinois-American Water Company. |

| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal arises from an order of the Illinois Commerce Commission (Commission) approving a general increase in the water and sewer service rates of Illinois-American Water Company (IAWC). More specifically, the Commission approved an increase in IAWC's authorized return on equity (ROE). Several intervenors in the proceedings below, Prairie Farms Dairy, Inc., United States Steel Corporation-Granite City Works, and the University of Illinois, as well as Citizens Utility Board (collectively, the intervenors), now appeal. On appeal, the intervenors assert that (1) the ROE approved by the Commission was not supported by substantial evidence, (2) the Commission failed to articulate a reasoned basis for its incorporation of size and leverage adjustments, and (3) the authorized ROE exceeded what was necessary to ensure IAWC's financial integrity and attract capital. For the following reasons, we affirm the Commission's order.

¶ 2                                    I. BACKGROUND

¶ 3    On January 21, 2016, IAWC filed with the Commission revised tariff sheets seeking a general increase in water and sewer rates. The Commission suspended the tariff sheets from taking effect and commenced this proceeding to investigate the proposed rate increase. As stated, several parties intervened.[1]

¶ 4    The purpose of the Public Utilities Act (Act) is to provide "adequate, efficient, reliable, environmentally safe and least-cost public utility services at prices which accurately reflect the long-term cost of such services and which are equitable to all citizens." 220 ILCS 5/1-102 (West 2016). The Commission uses the Act's rate of return principles to design and set just and reasonable rates for Illinois's least-cost public utility services. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 29. Those principles used to determine the revenue requirement take into account a recovery of prudent, reasonable costs as well as a return on equity.[2] *Id.* ¶ 30. In addition, the return should assure confidence in the utility's financial integrity in order to maintain its credit, attract capital (*Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944)), and compensate the utility's investors (see *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2015 IL App (4th) 140173, ¶ 8).

¶ 5    During this proceeding, the parties resolved several issues but were unable to agree on an appropriate authorized ROE for IAWC. While IAWC sought a 10.75% ROE, the intervenors asserted that 9% was appropriate. The staff of the Commission (Staff) recommended a ROE of 8.12%. The intervenors now challenge the Commission's ultimate determination that an initial ROE of 9.87% is appropriate.

---

[1]Several other entities participated below but are not parties to this appeal.

[2]The ratemaking formula is "R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital)." (Internal quotation marks omitted.) *People ex rel. Madigan*, 2015 IL 116005, ¶ 7.

¶ 7    Michael Gorman, a public utility regulation consultant, testified on behalf of the intervenors. Gorman testified that he used the discounted cash flow (DCF) and capital asset pricing model (CAPM) to measure the current market cost of equity.[3] The DCF model is based on the assumption that a stock's price equals the expected value of future dividends, discounted to present value, multiplied by the investors' required rate of return. See *id.* ¶ 26. Under the CAPM formula, a utility's required rate of return equals the sum of the risk-free rate and a risk premium. *Id.* ¶ 10.[4]

¶ 8    For DCF, Gorman used models for constant growth, sustainable growth, and multi-stage growth. Because IAWC is not a publicly traded company, he used water and gas proxy groups of publicly traded companies to approximate IAWC's investment risk. See *id.* ¶ 12 (stating, with respect to utilities that are not publicly traded, that proxy groups carrying approximately the same amount of risk are used). As to the water proxy group, DCF analysis produced the following average ROEs: (1) constant growth of 9.12%, (2) sustainable growth of 8.05%, and (3) multi-stage growth of 7.09%. DCF analysis for the gas proxy group produced these average ROEs: (1) constant growth of 9.12%, (2) sustainable growth of 9.48%, and (3) multi-stage growth of 7.64%. Based on the foregoing, Gorman's recommended DCF range was from 8.3% to 9.3%. Thus, he found his analysis supported a ROE of 8.8%, the midpoint of the range.

¶ 9    Gorman's CAPM analysis resulted in 8.49% for his water proxy group and 9.77% for his gas proxy group. After modifying those results, the CAPM study suggested a reasonable ROE between 8.5% and 9.8%, with a midpoint of 9.15%. Gorman rounded the midpoint to 9.2%. Accordingly, Gorman found these studies indicated that a reasonable ROE would be between 8.8% (DCF) and 9.2% (CAPM), for an estimated ROE of 9%. Gorman further opined that a 9% ROE would support an overall rate of return that would permit IAWC to have an investment grade bond rating.

¶ 10    That being said, Paul Moul, IAWC's expert and a financial and regulatory consultant, found Gorman's DCF results were too low and too unrealistic and certain results were "simply not credible." Moul also found Gorman's sustainable growth DCF and multi-stage growth DCF results were flawed and his CAPM results were incomplete. Furthermore, Moul found Gorman failed to establish a reasonable basis for comparing IAWC with Gorman's gas proxy group.

¶ 11    Moul testified on behalf of IAWC that he applied DCF, CAPM, risk premium analysis, and a comparable earnings study to a proxy group of publicly traded water companies. His constant growth DCF model led to a ROE of 9.72%. He had reduced his DCF results to account for IAWC having a higher level of debt than the proxy group (leverage adjustment). Additionally, after adjusting his CAPM outputs to reflect IAWC's smaller size (size adjustment), his CAPM results suggested a ROE of 11.03%. Thus, Moul's combined DCF and CAPM analyses indicated a range of 9.72% to 11.03% with a midpoint of 10.38%. Furthermore, Moul's risk

[3]Given the experts' extensive testimony debating the appropriate methods to be used and how to apply them in determining an appropriate ROE, we present only a limited recitation of the experts' positions.

[4]A risk premium is determined by multiplying the volatility of the utility's equity by the premium that investors expect the general market to pay above a risk-free investment. *Ameren Illinois Co.*, 2015 IL App (4th) 140173, ¶ 11.

premium analysis suggested a ROE of 11.25% and his comparable earnings analysis suggested a ROE of 13.05%.

¶ 12    Moul acknowledged, however, that all methods contain assumptions and constraints that are incomplete or overly restrictive. For example, he expressed concern for the circular nature of DCF analysis when used in rate cases. Moul further acknowledged his result did not take into consideration the possibility that unforeseen events would prevent IAWC from achieving its authorized rate of return, something that IAWC had not achieved for several years.

¶ 13    Moul determined that based on the foregoing analyses, a ROE of 10.75% represented a fair, reasonable cost of equity that would permit IAWC to attract capital to replace aging infrastructure. Moreover, Moul testified that his opinion assumed that the Commission would also approve a volume-balancing adjustment rider (Rider VBA): Without it, IAWC would have a higher risk profile than the utility companies in the proxy group.[5]

¶ 14    Gorman and Sheena Kight-Garlisch, a senior financial analyst in the Commission's Financial Analysis Division, found that Moul's size and leverage adjustments were inappropriate and, as a result, Moul's ROE of 10.75% was too high. They rejected Moul's suggestion that a leverage adjustment is required when a firm's capitalization, as measured by market value, varies from the book value capitalization. Additionally, had Moul excluded those adjustments, his DCF analysis would have resulted in a ROE of 9% and his CAPM analysis would have resulted in a ROE of 8.9%. Moul, however, added a leverage adjustment of 0.89 to both studies and a size adjustment to the CAPM result. Gorman and Kight-Garlisch disagreed with Moul's opinion that as a firm's size decreases, its risk and required return increase or that a size adjustment was required. Gorman and Kight-Garlisch further testified that the inputs for Moul's risk premium analysis inflated the risk premium.

¶ 15    Kight-Garlisch testified on behalf of the Staff that she performed DCF and CAPM analysis on water and utility proxy groups. With respect to DCF, she used a nonconstant, multi-stage growth model with three stages of dividend growth, which led to ROE estimates of 7.24% for her water proxy group and 7.51% for her utility proxy group. Kight-Garlisch declined to use the constant growth DCF model, finding that the near-term average dividend growth rate for the companies in her proxy groups were not sustainable long term. With respect to CAPM, she came to a ROE of 8.8% for the water proxy group and 8.9% for the utility proxy group, after making certain adjustments. She did not make adjustments based on size and leverage.

¶ 16    Kight-Garlisch testified that the average of her DCF and CAPM results for the water proxy group was 7.98%, while the average of her DCF and CAPM results for the gas proxy group was 8.16%. The average of both percentages was 8.07%, although she recommended a slightly higher ROE of 8.12%. Should the Commission approve IAWC's proposed Rider VBA, Kight-Garlisch suggested an additional reduction, to 8.04%. Moul extensively criticized Kight-Garlisch's analysis and found it led her to underestimate IAWC's return on equity.

¶ 17    We also note that IAWC's president, Bruce Hauk, testified that the utility had to compete with other companies and IAWC affiliates for discretionary capital and there was no incentive

---

[5]A Rider VBA attempts to accurately collect the revenue requirement through a transparent, symmetrical formula. See *People ex rel. Madigan*, 2015 IL 116005, ¶ 32. A Rider VBA does not guarantee net profits or net revenue but ensures the recovery of the revenue requirement determined by the Commission. *Id.* A Rider VBA offers a means for a utility to recover no more and no less than the utility's revenue requirement. *Id.*

for IAWC's shareholder, American Water Works Company, Inc., to invest in Illinois if it can get greater returns elsewhere. With a ROE of 8.04%, IAWC would have the lowest authorized ROE among its shareholder's various investment entities. Additionally, IAWC would need to reevaluate its investment decisions. Moul further testified that the investment community would be alarmed. Moreover, Moul opined that it was inappropriate to reduce a utility's ROE to account for a Rider VBA. The record further suggests that 8.04% would be the lowest ROE authorized in Illinois.

¶ 18                              B. The Authorized ROE

¶ 19    On October 19, 2016, the administrative law judges (ALJs) recommended that the Commission authorize a ROE of 8.92%. In reaching that percentage, the ALJs averaged the results of Gorman's constant growth DCF analysis, Moul's unadjusted constant growth DCF analysis, and Kight-Garlisch's CAPM analysis. The ALJs observed that the Commission had consistently rejected size and leverage adjustments. The intervenors, IAWC, and the Staff all filed briefs on exceptions to the ALJs' proposed order.

¶ 20    In a 92-page order entered on December 13, 2016, the Commission rejected the ALJs' recommendation. After acknowledging the difficulty in estimating ROEs, the Commission found that the ROEs presented by IAWC (10.75%), the intervenors (9%), and the Staff (8.12%) varied considerably, as did the expert witnesses' methodology. The Commission found that while the parties had identified shortcomings in each of the experts' opinions, Kight-Garlisch's determination was simply anomalous and an uncompetitive ROE would deter investment. Thus, the Commission rejected her suggested ROE of 8.12% (before deduction).

¶ 21    Consequently, the Commission averaged the 10.75% ROE recommended by Moul with the 9% ROE recommended by Gorman. The Commission found that averaging the ROEs suggested by IAWC and the intervenors, to 9.87 %, would minimize some of the flaws identified in the parties' respective analyses. Additionally, the order stated:

> "The Commission acknowledges that IAWC's DCF and CAPM results contain size and leverage adjustments. *** However, the ROE approved by the Commission in the instant docket is an average of IAWC's and [the intervenors'] ROE recommendations and not an endorsement of every input of every aspect of the methodologies performed by these parties. See Docket No. 14-0419 at 44."

The Commission then deducted an additional eight points from the ROE based on its approval of the IAWC's Rider VBA, in order to reflect IAWC's reduced operating risk.[6] The Commission determined that a ROE of 9.79% "was reasonable, supported by the record, and consistent with the governing legal standard." The intervenors now appeal.

¶ 22                                 II. ANALYSIS
¶ 23            A. The Act, the Commission's Role, and the Reviewing Court's Role
¶ 24    Under section 9-101 of the Act, "[a]ll rates or other charges made, demanded or received *** shall be just and reasonable." 220 ILCS 5/9-101 (West 2016). Section 9-201(c) further states that "[i]f the Commission enters upon a hearing concerning the propriety of any

---

[6]The rider and adjustment are not the subjects of this appeal.

proposed rate or other charge ***, the Commission shall establish the rates or other charges *** proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable." *Id.* § 9-201(c). Moreover, the utility has the burden of demonstrating that the proposed rate is just and reasonable. *Id.*

¶ 25 "The Commission is not merely an arbitrator between the utility and parties opposing a rate change[;] it is an investigator and regulator of utilities[,] responsible for the setting of just rates for all affected by the rates." *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 740 (1995). Its ratemaking function is legislative in nature. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 243 (1991). In addition, it is well settled that when it comes to "matters relating to services and rates of utilities technical data and expert opinion, as well as complex technological and scientific data, *** it [is] essential that the matter be considered by a tribunal that is itself capable of passing upon complex data." *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960). Moreover, the Commission has the authority to address each situation before it despite how the Commission may have previously addressed a similar situation. *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 307 (1997).

¶ 26 While the Act gives the Commission broad discretion, the Act also requires it to set forth analysis and findings sufficient to permit informed review by the appellate court. *Id.* at 304 (citing 220 ILCS 5/10-201(e)(iii) (West 1994)). Consequently, the Commission must provide more analysis and reasoning than what is required of a circuit court. *Id.* That being said, the Commission need not make specific findings on each claim or evidentiary fact. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 398 (2010). The Commission's findings are sufficient if they enable the reviewing court to engage in an intelligent, informed review of the Commission's order. *Id.*

¶ 27 Upon review, the Commission's factual findings and conclusions are *prima facie* true and its decisions are *prima facie* reasonable. 220 ILCS 5/10-201(d) (West 2016). In addition, "[t]he burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such *** decisions." *Id.* Moreover, the Commission is particularly entitled to deference with respect to fixing rates because determining rates is a matter of sound business judgment, which the legislature has entrusted to the Commission. *People ex rel. Madigan*, 2015 IL 116005, ¶ 23. This is because the Commission's members are highly qualified to interpret evidence provided by specialists and technicians. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 70; *cf. Thompson v. Illinois Commerce Comm'n*, 1 Ill. 2d 350, 356 (1953) (finding that because the case involved no technical questions or questions of rate where the Commission would be better situated to assess the evidence, the supreme court was not required to reach the same conclusion of the Commission). In contrast, judges are not utility regulators (*People ex rel. Madigan*, 2015 IL 116005, ¶ 22), and the wisdom of the Commission is not subject to inquiry (*Village of Apple River*, 18 Ill. 2d at 523). It follows that we must not reevaluate the credibility or weight of the evidence or substitute the Commission's judgment with our own unless that judgment was clearly against the manifest weight of the evidence. *People ex rel. Madigan*, 2011 IL App (1st) 100654, ¶ 70.

¶ 28 Consequently, a reviewing court will reverse the Commission's findings only if the record does not show they are supported by substantial evidence, the Commission exceeded the scope

of statutory authority, the Commission's findings were unconstitutional, or the Commission reached its decision in a manner, or through proceedings, that were unconstitutional and prejudiced the appellant. 220 ILCS 5/10-201(e)(iv)(A) (West 2016); see also *Monarch Gas Co. v. Illinois Commerce Comm'n*, 261 Ill. App. 3d 94, 101 (1994) (stating that a reviewing court can set aside the Commission's decision if it is clearly unreasonable).

¶ 29                    B. Substantial Evidence and Sufficient Findings

¶ 30     The intervenors assert that the Commission's decision was not supported by substantial evidence and sufficient findings. Before addressing their specific contentions, however, we find it inappropriate at this juncture for the intervenors to rely on the expert opinion of Kight-Garlisch, the expert for the Staff. A party must assert his own legal interests and rights, not those of third parties. *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 36. The intervenors have not developed a cohesive argument explaining why they should be permitted to rely on another party's evidence. See *Enbridge Pipeline (Illinois), LLC v. Monarch Farms, LLC*, 2017 IL App (4th) 150807, ¶¶ 79-80 (finding that failure to develop a cohesive argument results in forfeiture). More importantly, we find the Commission's order was supported by substantial evidence and sufficient findings.

¶ 31     Essentially, the intervenors suggest that in order for substantial evidence to have supported the ROE approved by the Commission, the record would need to show that (1) a witness recommended a 9.87% ROE, (2) that witness supported his testimony with additional evidence showing a ROE of 9.87% was appropriate, and/or (3) a witness testified that a ROE falling outside the range suggested by the witnesses would be proper. The intervenors contend that the varying expert opinions did not permit the Commission "to cobble together" an authorized ROE. Contrary to the intervenors' position, that is precisely what the Act permits the Commission to do.

¶ 32     To the extent that the Commission's decisions are neither arbitrary nor capricious and are based on credibility determinations, the Commission has wide latitude to exercise its business judgment to implement pragmatic solutions by "filling gaps in the record." *Commonwealth Edison Co.*, 405 Ill. App. 3d at 402. Establishing a just and reasonable rate presents a question of sound business judgment, rather than the application of a legal formula, and must often be a tentative determination given that one cannot predict exact results. *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442 (1960). The intervenors fundamentally misunderstand the Commission's role.

¶ 33     Here, the Commission did not pull a number out of the air. Instead, the Commission filled in the gaps left by the parties. The Commission observed that all three experts were subject to meaningful criticism, Kight-Garlisch more than the others. Stated differently, the Commission clearly found that the experts' criticisms of each other were credible. Yet, the Commission determined that the opinions of Gorman were not entirely unfounded, notwithstanding that the flaws of one expert apparently led to an overstated ROE and the flaws of the other apparently led to an understated ROE.

¶ 34     The intervenors challenge as conclusory the Commission's statements that the parties pointed out flaws in each other's analyses and that averaging the results would minimize such shortcomings. While the Commission did not explicitly state that any particular flaws precluded adopting one recommendation over another, context made the Commission's position clear in that regard. The Commission must make sufficient findings to permit review,

but this does not mean that a reviewing court must ignore context or the Commission's unmistakable meaning. Moreover, in context, the Commission's order makes clear that, as the testimony of Moul and Hauk showed, a ROE of 8.12% was far too low to allow IAWC to compete for capital investment. The Commission had also been presented data showing how very low a ROE of 8.12% would be when compared to other utilities' ROEs. See *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994) (stating that the challenger must show that the opposite conclusion is clearly evident, not merely that the evidence could support a different conclusion); *Metro Utility Co. v. Illinois Commerce Comm'n*, 262 Ill. App. 3d 266, 278 (1994) (stating that the presentation of contradictory evidence is not sufficient to reverse the Commission's order).

¶ 35 Ideally, one expert would have presented flawless analysis suggesting impeccable accuracy in determining what ROE is appropriate in this instance, thereby allowing the Commission to categorically adopt the conclusion of one witness. Unfortunately, this is not the nature of ratemaking. See *Amax Zinc Co. v. Illinois Commerce Comm'n*, 124 Ill. App. 3d 4, 11 (1984) (stating that ratemaking is not an exact science and lacks precision). Indeed, the Commission was within its authority to find that neither Gorman nor Moul provided a nonpareil opinion.

¶ 36 The Act requires "substantial evidence," not conclusive evidence. Substantial evidence requires more than a mere scintilla but less than a preponderance of evidence and requires evidence that a reasoning mind would find to be sufficient support for a particular conclusion. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009); *cf.* 5 ILCS 100/10-15 (West 2016) (stating under the Illinois Administrative Procedure Act that "[u]nless otherwise provided by law or stated in the agency's rules, the standard of proof in any contested case hearing conducted under this Act by an agency shall be the preponderance of the evidence"). Substantial evidence can support multiple possible findings. *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 479 (1994).

¶ 37 Presented with the insightful, albeit imperfect, calculations of Gorman and Moul, *i.e.*, substantial evidence, the Commission used its expertise to determine that an average would be reasonable. The Commission's order clearly shows how the figure of 9.87% was arrived at. *Cf. Citizens Utility Board*, 291 Ill. App. 3d at 305-06 (finding that while evidence might have supported the Commission's decision, the Commission's order lacked the specificity required by the Public Utility Act because the order failed to specify what "distortions" could occur if the entire marginal cost study distinguished between new and existing customers); *Emera Maine v. Federal Energy Regulatory Comm'n*, 854 F.3d 9, 23, 27-30 (D.C. Cir. 2017) (finding that the agency administering the Federal Power Act (16 U.S.C. §§ 824d(a), 824e(a) (2012)) failed to explain why the rate chosen was just and reasonable where the agency, among other things, (1) did not identify the unusual capital market conditions warranting a change from the usual practice of setting the rate at the midpoint of the zone of reasonableness, (2) acknowledged that the alternative methods used did not lead to the specific rate chosen, (3) did not find that said rate would attract capital, and (4) identified inapposite cases supporting that rate).

¶ 38 We also find the Commission's citation, "See Docket No. 14-0419 at 44," is neither vague nor confusing. In that case, on the page cited, the Commission stated that their decision to average the experts' results was not an endorsement of one expert's use of a leverage and size adjustment, and that averaging results would reduce "the effects of perceived shortcomings

- 8 -

and biases described in the competing positions of the parties." See *Aqua Illinois, Inc.*, Ill. Comm. Comm'n No. 14-0419, at 43 (Order-Final Mar. 25, 2015); *cf. Citizens Utility Board*, 291 Ill. App. 3d at 306 (rejecting the Commission's reliance on an earlier order whether the present order involved no similar analysis or reasoning). Given that the citation was provided after stating that the Commission was not endorsing every input used by the experts, the purpose of the citation is entirely clear. The Commission in both the present and prior case was declining to endorse the questionable adjustments. Only willful blindness could leave one in doubt of the Commission's reason for citing the prior order.

¶ 39    The intervenors further argue that substantial evidence did not support the Commission's inclusion of size and leverage adjustments in the approved ROE. They add, "[t]here are no findings of fact that explain why the Commission has determined size and leverage adjustments are acceptable, after decades of declining to do so." The simple answer, once again, is that the Commission did not make such a determination, as the intervenors well know. As the intervenors acknowledge, the Commission specifically stated that it was not endorsing the entirety of the parties' ROE analyses. Instead, the Commission's order shows it was averaging the two ROE's to offset the flaws in both experts' opinions.

¶ 40    Moreover, contrary to the intervenors' contention, the Commission's decision to average the parties' ROEs, does not conflict with that representation. Had the Commission actually endorsed Moul's size and leverage adjustments, it may very well have found that the credibility of his opinion was markedly superior to Gorman's opinion and authorized a ROE closer to 10.75%. Moreover, the intervenors ignore that if the Commission's practice of averaging results endorsed the flaws in IAWC's position, the Commission likewise endorsed the flaws in the intervenors' position. The intervenors have developed no argument showing that the Commission incorrectly found flaws in Gorman's analysis.

¶ 41    In short, we find that despite the intervenors' characterization of its contentions, they essentially ask this court to reweigh the evidence and override the Commission's sound business judgment. We decline to do so.

¶ 42    We further reject the intervenors' contention that the Commission's decision is entitled to less deference here because it departed from past practice. See *People ex rel. Madigan*, 2015 IL 116005, ¶ 25 (stating that the Commission's decision will be entitled to less deference on review only when it departs from the Commission's usual rules to obtain a different unexplained result in a single case); *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 131-32 (1995) (stating that the Commission's decisions are entitled to less deference when they drastically depart from the Commission's past practices). The Commission has repeatedly averaged imperfect analyses.[7] See *People ex rel. Madigan*, 2011

_____

[7]There are numerous examples of the Commission averaging an imperfect analysis. See *Ameren Illinois Co.*, Ill. Comm. Comm'n No. 11-0282, at 126-27 (Order-Final Jan. 10, 2012) (after finding that no party's ROE position stood out as being particularly superior to any other party's position, the Commission decided to average the parties' positions, according them equal weight); *Liberty Utilities (Midstates Natural Gas) Corp.*, Ill. Comm. Comm'n No. 14-0371, at 66 (Order-Final Feb. 11, 2015) (finding that "blending the Parties' proposals in this manner results in an average return that significantly diminishes any perceived upward or downward bias"); *North Shore Gas Co.*, Ill. Comm. Comm'n Nos. 11-0280 & 11-0281 (cons.), at 138-40 (Order-Final Jan. 10, 2012) (finding that one expert's size adjustment was unwarranted but that all parties' expert opinions were flawed, and averaging the experts' determinations); *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d

IL App (1st) 100654, ¶ 74 (observing that the Commission averaged two experts' opinions as to the rate of return on equity before making two downward adjustments). This is entirely within the Commission's function of devising pragmatic solutions. We find the intervenors' contention to be disingenuous.

¶ 43                                   C. *Bluefield* and *Hope*

¶ 44     Finally, the intervenors contend that the Commission's order does not satisfy the criteria set forth by the United States Supreme Court in *Bluefield Water Works & Improvement Co. v. Public Service Comm'n of West Virginia.*, 262 U.S. 679, 692-93 (1923), and *Hope Natural Gas Co.*, 320 U.S. at 603.[8] Specifically, they argue that the ROE authorized by the Commission was "significantly higher than necessary to maintain the IAWC's financial integrity and attract capital at reasonable terms."

¶ 45     A utility's return should be reasonably sufficient to permit confidence in the utility's financial soundness and, with economical and efficient management, to support the utility's credit and raise funds necessary to properly discharge the utility's public duties. *Bluefield Waterworks & Improvement Co.*, 262 U.S. at 693. Additionally, "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Hope Natural Gas Co.*, 320 U.S. at 603. An investor has a legitimate concern with the utility's financial integrity, which requires that it have enough revenue for operating expenses and capital costs. *Id.* Thus, *Bluefield* and *Hope* address the need for minimum returns, not the intervenors' concern with maximum returns.

¶ 46     In any event, the Commission expressly acknowledged in its order that *Bluefield* and *Hope* required the Commission to "consider whether the authorized return will allow a return that is sufficient to maintain the utility's financial integrity and to attract capital at reasonable terms, while ensuring that customers do not pay an excessive or reasonable return on those rates." The Commission subsequently determined that a ROE of 9.79% "was reasonable, supported by the record, and consistent with the governing legal standard." The Commission's determination finds support in the record. See also *id.* at 602 (stating that "[i]f the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [federal Natural Gas Act of 1938 (15 U.S.C. § 717 *et seq.* (1940))] is at an end").

¶ 47     Notably, the intervenors argue that Gorman testified that a ROE of 9% would maintain IAWC's financial integrity but ignore that Moul criticized Gorman's analysis. As the Commission observes on appeal, Gorman admitted that his analysis was not as comprehensive

---

550, 560-61 (1971) (where the utility claimed $31,680 in salaries paid as operating expense and the intervening homeowners associations instead suggested $0 was appropriate, the reviewing court found the Commission properly allowed the utility to claim $15,840, half of its original claim); *North Shore Gas Co.*, Ill. Comm. Comm'n Nos. 12-0511 & 12-0512 (cons.), at 205-08 (Order-Final June 18, 2013) (finding that averaging the analyses used by the Staff and the utilities was an appropriate basis to determine the ROE and that doing so did not endorse every aspect of their analyses); *Ameren Illinois Co.*, Ill. Comm. Comm'n No.13-0192, at 166 (Order-Final Dec. 18, 2013) (finding that averaging the DCF and CAPM results would minimize the effects of the shortcomings of the parties' positions), *aff'd Ameren Illinois Co.*, 2015 IL App (4th) 140173, ¶¶ 20, 56 (suggesting that the practice of averaging could depend on whether there were defective inputs and what the defective inputs were).

[8]*Bluefield* involved a Virginia statute, whereas *Hope* involved the federal Natural Gas Act of 1938.

as Standard & Poor's financial review. In addition, the intervenors ignore that Moul recommended a ROE of 10.75% to assure confidence in IAWC's financial integrity. Moul also testified that investors would view a significant reduction in IAWC's ROE as being unhelpful to the utility's financial health. Furthermore, Hauk testified that the utility had to compete with other companies and IAWC affiliates for discretionary capital and it would not make sense for IAWC's shareholder to invest in IAWC if the shareholder could achieve greater returns elsewhere. IAWC, however, had the lowest authorized ROE of its shareholder's various investment entities. See *Hope Natural Gas Co.*, 320 U.S. at 602 (stating that the Federal Power Commission was not required to use any particular formula and that ratemaking requires pragmatic adjustments). Finally, the intervenors' contention that IAWC failed to identify any specific capital investment that could not be made at a ROE below 9% is misleading, as the record essentially shows that IAWC's capital investments would need to be reevaluated with a lower ROE. *Id.* at 603 (stating that establishing a just and reasonable rate under the federal Natural Gas Act of 1938 involves balancing the interests of the consumer with those of the investor).

¶ 48                                    III. CONCLUSION

¶ 49        Here, the Commission's order was supported by sufficient findings and substantial evidence. Having considered the parties' contentions, the record, and the Commission's decision, we find no basis to reverse that decision or remand for further proceedings. See 220 ILCS 5/10-201(e)(iv)(A) (West 2016).

¶ 50        For the foregoing reasons, we affirm the Commission's decision.

¶ 51        Affirmed.